Argued January 14, decided January 27, 1914.

## CAWLFIELD *v.* SMYTH.*

(138 Pac. 227.)

**Waters and Watercourses—Meander Line.**

1.   The ordinary high-water mark constitutes the true meander line of public lands granted by the United States.

**Waters and Watercourses—Description—Meander Line.**

2.   A survey of a meander line need not follow all the sinuosities of a river or lake foot by foot, but is sufficient if it fairly represents the average of the mean high-water mark of the body of water in question.

**Waters and Watercourses—Description—Meander Line.**

3.   If by mistake or fraud a surveyor omits large tracts, placing them inside a meander line instead of bounding them by the survey of the meander line with reasonable accuracy, the purchaser of abutting lands will take only to that line and not beyond.

**Waters and Watercourses—Riparian Rights—"Recession"—"Avulsion."**

4.   An owner of land bordering a body of water is entitled to follow the water as it recedes, and hold the land uncovered, and is not limited to a particular amount acquired in this way; but by "recession" is not meant a sudden "avulsion" which changes the channel of a stream so as to cut off land in large quantities.

> [As to natural flow of the stream to which riparian owner has right, see note in 79 Am. Dec. 638. And see note in Ann. Cas. 1914A, 82.]

From Harney: WILLIAM SMITH, Judge.

*The question of meander line as boundary is treated in note in 42 L. R. A. 510.                                    REPORTER.

Department 1.   Statement by MR. JUSTICE BURNETT.

This is an action of ejectment in statutory form by Frank Cawlfield against D. A. Smyth and Claud H. Smyth, in which the defendants admitted being in possession of the lands in dispute, but denied all other allegations of the complaint.   A jury trial resulted in a verdict and judgment for the defendants, and the plaintiff appeals.          REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. C. A. Sweek* and *Messrs. Emmons & Webster,* with oral arguments by *Mr. Sweek* and *Mr. Lionel R. Webster.*

For respondent there was a brief and an oral argument by *Mr. Will R. King.*                             .

MR. JUSTICE BURNETT delivered the opinion of the court.

The plaintiff is the owner of certain fractional subdivisions of sections 27 and 28, township 26 south, range 31 east of the Willamette meridian, in Harney County, bounded on the north by the meander line of Malheur Lake, a non-navigable body of water, fed by Silvies River on the north and Blitzen River on the south, and finding its outlet through a channel which its waters have forced into Harney Lake.   The land in dispute is on the lake side of this meander line, and lies in front of the lots owned by the plaintiff, although other land of a similar nature intervenes between them and the premises he would recover.   The plaintiff claims these lands as accretions to his lots, which he purchased and holds under a patent from the United States government.   His contention is that, his lands being bounded by the meander line of the lake, as evidenced by the official plats, he takes by

operation of law, as an accretion, all land beyond the line and uncovered by the recession of the lake. The defendants maintain that the meander line as laid upon the ground, and forming on the maps of the survey the north boundary of the lots owned by the plaintiff, did not truly represent the meander of the lake at the time it was surveyed, and that he is privileged to show that fact, with the result that plaintiff cannot take any land north of the actual meander line as thus traced, and is forbidden to advance his boundary with the retreating waters.

Another question involved is based upon plaintiff's objections to sundry instructions given by the court to the jury. The meander line in question was surveyed by a deputy United States surveyor in 1895. Among other things the court charged the jury thus:

"I instruct you, gentlemen, that if you find a meander line or some line of survey was run along the northern boundary of the lands last described [meaning the lots owned by plaintiff] that is not conclusive evidence of the existence of a lake at that point. You will therefore weigh and consider all of the evidence in this case, and the facts, the conclusion, to be deduced from the whole evidence is to determine whether in fact there was a lake north of and adjoining plaintiff's land described in his patent, and if there was not such lake at the time such meander line was run, to wit, in the year 1895, you will find for the defendants; that is to say, I instruct you that before you can find for the plaintiff, you must be satisfied from a preponderance of the evidence that during the year in which such meander line was run there was a lake immediately north of and adjoining the land described in plaintiff's patent as belonging to him, but if you believe from the evidence that there was a swamp or marsh instead of a lake, immediately north of and adjoining said lands, then you will find for the defendants. In other words, it is a fact for you to

determine whether there was a lake. If there was such lake at the meander line, the plaintiff should recover, if the land uncovered by the recession of the lake, which said recession you find to have been natural and gradual, be not of such considerable area or amount as would increase his holdings and possessions under his patent to such an extent as would be unreasonable and beyond the possible intention of the government in the execution of said patent.''

Again, after the jury had retired and been in deliberation for some time, they returned and asked the court for further instructions respecting the amount of land the plaintiff might recover.

Whereupon the court gave the following instruction:

''With reference to the amount of land that the plaintiff—a plaintiff in proceedings of this kind might claim by virtue of the fact that his holdings are separated from the lake by means of a meander line, I instruct you that a meander line should mark the shore line of abutting property, if such line is properly surveyed. If it does not mark such line practically, it is not a true meander line, and should be disregarded. It is not necessary that this line shall coincide with the edge of the lake by following the true curvature of the shore line. It may consist of broken straight lines, and is to control if it is so located as not to leave a considerable body of land between the said meander line and the water's edge when the lake is at its usual or ordinary state. So in this case, if the meander line of 1895 fairly marks the shore line of the lake at that time, it would be controlling here, and the plaintiff must recover, unless the recession of the waters from the original shore line of the lake as shown by that survey has been so great as to add a very considerable quantity of land, amounting to as much or more land as that described in the patent which the plaintiff obtained from the government, in which latter case the meander line must be regarded

as his north boundary, and he cannot recover here in such case."

1. Respecting the true meander line, it was held in *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418), that the ordinary high-water mark constitutes the true meander line.    The same doctrine was approved in the case of *State* v. *Portland General Electric Co.,* 52 Or. 502 (95 Pac. 772, 98 Pac. 160); Mr. Justice EAKIN saying: "That the point to which the water usually rises, in an ordinary season of high water, is the meander line, and that this line forms the boundary of the title of the United States."    This is the policy adopted by the general government in its surveys.    In paragraph 154, page 62, Manual of Surveying Instructions for the Survey of the Public Lands of the United States, it is said: "Lands bounded by waters are to be meandered at mean high-water mark."    Further, in paragraph 157, it is said: "Navigable waters, as well as all rivers not embraced in the class denominated navigable, the right angle width of which is three chains and upward, will be meandered on both banks at the ordinary mean high-water mark."    Finally, in paragraph 168, page 64, the rule is laid down: "Meander lines will not be established at the segregation line between dry and swamp or overflowed land, but at the ordinary high-water mark of the actual margin of the river or lakes on which such swamp or overflowed land borders."

2. It is impracticable to trace out meander lines which follow foot by foot all the sinuosities of an ordinary lake or river.    It is sufficient if the survey fairly represents the average of the mean high-water mark of the body of water in question.    In the very nature of things any feasible survey of the meander under this rule will leave on the lake side of the line more or less land in spots which may be in fact above high-water mark.    This is the doctrine laid down by

this court in *French Livestock Co.* v. *Springer,* 35 Or.
312 (58 Pac. 102), quoting with approval *Barnhart* v.
*Ehrhart,* 33 Or. 274 (54 Pac. 195).

3. On the other hand, all the cases on this subject
recognize the doctrine elaborated by Mr. Justice
MOORE in this latter decision, that, if by mistake or
through fraud the surveyor omits large tracts of land,
placing them inside the meander line instead of bound-
ing them by that survey with reasonable accuracy, the
purchaser of lands abutting upon such a meander will
take only to that line, and not beyond. Hence it is a
question of fact in case of dispute whether or not the
survey did reasonably trace the mean high-water line
of the lake or stream in question with a meander line
properly established so as to fairly represent the aver-
age of the mean · high-water mark. Consequently
nothing here stated is intended to preclude a proper
inquiry about whether the meander line coincided
fairly with the average of the high-water mark as the
same existed when the survey was made.

4. It is a well-established rule that the grantee will
take at least to the actual margin of the water, whether
within or without the line as properly surveyed on the
ground, and that he is entitled to follow the water
as it recedes, and to hold and enjoy the land thus un-
covered. By recession is not meant a sudden avulsion
which changes the channel of a stream so as to cut off
land in large quantities; but where a lake recedes from
its original meander lines rightly surveyed, the owner
of the lands bounded by such meanders is entitled to
follow the water however far it retires, or however
much land may be uncovered by the recession.

Concerning this very lake this court, speaking by
Mr. Justice WOLVERTON, in *French Livestock Co.* v.
*Springer,* 35 Or. 312 (58 Pac. 102), said: "It is a ques-
tion of no moment to the parties in the present con-

troversy whether the shore or upland owner takes to the water's edge or to the center of a non-navigable lake, or what title, if any, has been acquired by reason of such ownership, without reservation in the muniments of the title to the land under the water of the lake, as, in any event, the owner is entitled to all land between the original line and the water's edge, which shall have become bare by accretion or a gradual and imperceptible recession of the water, not extending beyond the center of the lake." In good reason there can be no difference in principle between non-navigable lakes and non-navigable rivers respecting recessions and accretions, especially where, as in this instance, both alike rise and fall in the wet and dry seasons. It is said in a work on Elementary Physical Geography by William Morris Davis: "Lakes may be generally taken to indicate a useful drainage system. In time they will be destroyed; partly by filling with the waste that is brought by the inflowing streams, partly by the deepening of the outlet valley. Lakes should therefore be regarded as only temporary features in the long life of the river system to which they belong. The rivers may remain long after the lakes disappear." It is laid down in *Hardin* v. *Jordan*, 140 U. S. 371 (35 L. Ed. 428, 11 Sup. Ct. Rep. 808, 838), that "grants by the United States of its public lands bounded on streams and other waters, made without reservation or restriction, are to be construed as to their effect according to the laws of the state in which the lands lie. It depends upon the laws of each state to what extent the prerogative of the state to lands under water shall extend." At the argument the case of *Scott* v. *Lattig*, 227 U. S. 229 (57 L. Ed. 490, 33 Sup. Ct. Rep. 242, 44 L. R. A. (N. S.) 107), was cited as modifying the rule laid down in *Hardin* v. *Jordan*, 140 U. S. 371 (35 L. Ed. 428, 11 Sup. Ct. Rep. 808), but the

two cases are unlike in this: That the Hardin-Jordan case relates to a non-navigable lake, while the other case has to do with a fixed and well-defined island in a navigable river. The case at bar is more like *Whitaker* v. *McBride,* 197 U. S. 510 (49 L. Ed. 857, 25 Sup. Ct. Rep. 530), in which the Supreme Court of the United States decided that, "by the law of Nebraska * * the riparian proprietors are the owners of the bed of a stream to the center of the channel; that the government as original proprietor has the right to survey and sell any lands, including islands in a river or other body of water; that if it omits to survey an island in a stream, and refuses, when its attention is called to the matter, to make any survey thereof, no citizen can overrule the action of the department, assume that the island ought to have been surveyed, and proceed to occupy it for the purposes of homestead or preemption entry. In such a case the rights of riparian proprietors are to be preferred to the claims of the settler." Section 878, L. O. L., declares: "The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful, and there are no other sufficient circumstances to determine it: * * (4) When a road or stream of water not navigable is the boundary, the rights of the grantor to the middle of the road, or the thread of the stream, are included in the conveyance, except where the road or bed of the stream is held under another title." In *Micelli* v. *Andrus,* 61 Or. 78, (120 Pac. 737), Mr. Justice Moore said:

"The United States originally owned the bed of each unnavigable river, and, when any land bordering thereon is granted by the general government or its successors in title, by describing a border line as running to a bank of the stream and thence with its meanders, giving them, the boundary of the premises

conveyed, unless restricted by express words, extends by the overwhelming preponderance of judicial utterance to the center of the river.''

Until legislation of the state has changed its policy on this point, we must hold that the riparian owner of land granted by the general government abutting upon a correctly established meander line is at least entitled to follow the water of the lake or river thus meandered, no matter how far it may recede. The Circuit Court was in error when it undertook to limit the plaintiff in the amount of his accretion resulting from the retreat of the water in front of his original holdings.

The judgment of the Circuit Court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE MOORE and MR. JUSTICE RAMSEY concur.