Argued March 3; affirmed April 21; rehearing denied
June 16, 1936

# LUSCHER *v.* REYNOLDS ET AL.
## (56 P. (2d) 1158)

*Wilber Henderson,* of Portland (Henderson & Warner, of Portland, on the brief), for appellants.

*T. A. Weinke,* of Portland (Weinke & Amstutz, of Portland, on the brief), for respondent.

BELT, J. Plaintiff commenced this action to recover on a promissory note executed by defendants on May 15, 1930, in the sum of $3,000, evidencing the balance due on the purchase price of real property. Defendants admit the execution of the note, but allege in answer thereto a counterclaim for damages sustained by reason of a breach of warranty of title. The cause was submitted to a court, without a jury, and judgment rendered in favor of plaintiff for the amount due on the note. The defendants appeal.

The vital issue in the case relates to the title to a part of the land sold. In 1926, the defendant McCrillis entered into a contract with the plaintiff to purchase at a price of $500 per acre certain land abutting upon Blue lake which is about eight miles from the city of Portland. Later defendants McGill and Reynolds acquired from McCrillis an interest in the contract of sale. The three defendants thereupon organized Blue Lake, Inc., a corporation, for the purpose of developing the property as a summer resort and recreational center. In 1928 the plaintiff, pursuant to contract, conveyed by warranty deed 2.5 acres on the north side of the lake to Blue Lake, Inc., and in 1930 a similar deed was executed by plaintiff conveying to the same grantee 15.727 acres on the south side of the lake. A lodge was erected by defendants on the north side of the lake and the property was platted into lots for the purpose of resale. A controversy soon arose between the parties relative to the ownership of a narrow strip of land bordering on the lake, which is alleged to have been uncovered as a result of the drainage of the lake in 1924 by Multnomah Drainage District No. 1.

The defendants contend that, as a result of the drainage of the lake, the strip of land on the north side thereof containing .45 of an acre and the strip on the south side containing 1.65 acres were not owned by plaintiff at the time the warrant deeds were executed. The defendants, with good reason, assert that the land purchased is chiefly valuable for recreational purposes and that if title to the strips of land in question is not vested in them substantial damages have been sustained.

The plaintiff, among other things, asserts that there has been no substantial recession of the water in the lake and that, even if it be assumed that such recession did occur as alleged by defendants, the title to the land in controversy was vested in him at the time the deeds were executed—hence no breach of the covenants of title. Relative to the alleged recession of the water the plaintiff relies on evidence in the record that, in the winter of 1919 and 1920, a dam was constructed at the natural outlet of the lake on the west end thereof causing the water to overflow the land of riparian owners to the depth of two or three feet and that, when the canal ditch was dug at the east end of the lake in 1924, the water drained from the lake did not substantially change the water level from what it was prior to the building of the dam in 1919.

We are unable to reconcile or comprehend the findings of fact of the trial court relative to the issue as to whether there has been a substantial recession of the water due to artificial drainage. In the "special findings" the court found:

"(a) The low 'low water' line has not been changed. (b) The mean 'high water' line has been permanently lowered. (c) Said lowering has resulted in uncovering

that part of the original bed of said lake along the north side thereof as alleged.''

In the general findings the court found that in 1919 the natural outlet of the lake was closed, thereby raising the water level from three to five feet, but that "in the spring of 1923, it was *restored to approximately its former low level* by the opening of a channel at the east end of the lake.'' (Italics ours.) The findings as to whether the lake is navigable or non-navigable are likewise indefinite and uncertain.

In the consideration of the case we are assuming there was a recession of the water as alleged by defendants, although the evidence is conflicting on such issue. In so doing, we are confronted with the interesting question as to the ownership of the land thus uncovered which was formerly a part of the bed of the lake.

When Crosby and his wife—from whom plaintiff by mesne conveyance acquired title—obtained a deed in 1865 from the United States to 642.53 acres, the description of the land thus conveyed discloses that the meander lines of Blue lake were run. It is also observed from reading the description, with reference to the photostatic copy of the government plat, that the following subdivisions of section 21 of T. 1, N. R. 3 are rendered fractional by running the meander lines of Blue lake; N. E. ¼ of S. W. ¼, N. W. ¼ of S. E. ¼, N. E. ¼ of S. E. ¼ and N. W. ¼ of S. W. ¼. In the deeds executed by plaintiff the lake was made a boundary of the land conveyed. In reference to the 15.727 acre tract, we note the call: "* * * thence southerly and westerly along the shore line of Blue Lake to the west line of the John Crosby D. L. C. * * *.'' In the description of the 2.5 acre tract one of the calls is:

"* * * thence easterly following the boundary of Blue Lake to a point in a line running south * * *."

There is no contention that the meander lines as run by the government failed substantially to follow the ordinary high-water mark of the lake. Hence it follows that the shore line of the lake marks the true boundary of the land conveyed. Under such circumstances it is not the meander lines but the lake itself that marks the true boundary of the riparian owner: *State v. Imlah,* 135 Or. 66 (294 P. 1046); *Hanson v. Thornton,* 91 Or. 585 (179 P. 494); *Armstrong v. Pincus,* 81 Or. 156 (158 P. 662); *Weiss v. Oregon Iron and Steel Co.,* 13 Or. 496 (11 P. 255). In *Hardin v. Jordan,* 140 U. S. 371 (35 L. Ed. 428, 11 S. Ct. 808), it is said:

"It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the Federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary."

In the solution of the troublesome problem as to the ownership of that part of the bed of the lake uncovered by recession of the water, we are not aided by cases where land has been gained by accretion or reliction. It is well established that a riparian owner follows the water when there has been a gradual or

imperceptible reliction. We are, however, dealing with a case where there has been an artificial drainage.

There is nothing in the language of the grant from the United States to the Crosbys indicating any intention of the grantor to reserve the bed of Blue lake, hence the conveyance is to be construed, as stated in *Hardin v. Jordan,* supra, "according to the law of the state in which the lands lie". Such also is the holding in *Mitchell v. Smale,* 140 U. S. 406 (35 L. Ed. 442, 11 S. Ct. 819, 840), and in *Kean v. Calumet Canal Co.,* 190 U. S. 452 (47 L. Ed. 1134, 23 S. Ct. 651). The disposition of lands owned by the Federal government is a matter of the intention of the grantor: *United States v. Oregon,* 295 U. S. 1 (79 L. Ed. 1267, 55 S. Ct. 610), and, as stated in *Oklahoma v. Texas,* 258 U. S. 574 (66 L. Ed. 771, 42 S. Ct. 406), "* * * if its intention be not otherwise shown it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies".

Turning for the solution of our problem to the laws of this state, we find it well established that, when the Federal government grants land bordering on a navigable stream, the grantee takes to the ordinary high-water mark and that title to the bed of the stream is vested in the state: *United States v. Utah,* 283 U. S. 64 (75 L. Ed. 844, 51 S. Ct. 438) ; *Micelli v. Andrus,* 61 Or. 78 (120 P. 737), and numerous cases from this jurisdiction cited therein. State ownership in the beds of navigable streams followed upon admission to the Union. If the stream is not navigable, within the meaning of the Federal decisions, the title to the bed of the river or lake would remain in the United States until conveyed: *United States v. Utah,* supra. Federal law

controls in the disposition of government land: *United States v. Oregon,* supra. Clearly, under the Federal test for the determination of the navigability of streams, this small inland lake, which is only one mile long and one-eighth mile wide, can not be regarded as a navigable body of water in the sense that the title to the bed of the lake would pass to the state by virtue of its admission to the Union: *United States v. Utah,* supra; *The Daniel Ball,* 10 Wall 557 (19 L. Ed. 999).

■ If it be assumed that Blue lake is non-navigable, it is clear, under the statute and authorities of this state, that the Crosbys took to the center of the lake. Subdivision 4, § 63-102, Oregon Code 1930, enacted in 1862 (three years before the Crosby patent was issued) provides:

"When a road or stream of water not navigable is the boundary, the rights of the grantor to the middle of the road, or the thread of the stream, are included in the conveyance, except where the road or bed of the stream is held under another title."

In *Micelli v. Andrus,* supra, quoted with approval by Justice Burnett in *Cawlfield v. Smyth,* 69 Or. 41 (138 P. 227), it is said:

"The United States originally owned the bed of each unnavigable river, and, when any land bordering thereon is granted by the general government or its successors in title, by describing a border line as running to a bank of the stream and thence with its meanders, giving them, the boundary of the premises conveyed, unless restricted by express words, extends by the overwhelming preponderance of judicial utterance to the center of the river."

Furthermore, this court in the early case of *Shaw v. Oswego Iron Co.,* 10 Or. 371 (45 Am. Rep. 146), recognized the right of riparian owners to the middle of the stream.

In view of the grant from the Federal government, without any reservation or restriction, it is evident that the title to the bed must be either in the state or in the defendants. Having shown that the lake is not a navigable body of water in the light of the Federal decisions, it follows that ownership of a ratable part of the lake in question is in defendants. Hence, no breach of warranty of title.

■ If it be assumed that the lake is navigable and that title to the bed passed to the state, we still think there can be no recovery for breach of warranty as the defendants, or their predecessor in title, had the right, under section 60-705, Oregon Code 1930, in the event of artificial drainage of the lake, "to fill out the least fractional subdivision or subdivisions of any section owned by such riparian owners and which is rendered fractional by the meander line of such lake or lakes * * *". The evidence shows that if the strip in controversy were added to the land admittedly owned by defendants it would not "fill out" the subdivisions above mentioned rendered fractional by the meander of the lake. Section 60-705, Oregon Code 1930, provides as follows:

"It is hereby declared that there is and shall hereafter be no vested rights in or to any future accretion or reliction to the lands of any upland or riparian owner or owners on any such lake or public waters and after this act takes effect no person, firm or corporation shall acquire any right, title or interest in or to the beds of any such public waters or any part thereof, by reliction, accretion or otherwise, or by reason of the lowering or drainage of the waters of such lakes, except in the manner which now is, or may hereafter be provided by law; *provided further, however, that upon the drainage of such lakes* aforesaid, the title of owners of land riparian to such lakes which have heretofore

or may be hereafter drained under any of the provisions of the laws of the state of Oregon is hereby declared to extend to so much of the bottom or bed of such lake or lakes which have or which may be hereafter reclaimed by such drainage as is required to *fill out the least fractional subdivision or subivisions of any section owned by such riparian owners and which is rendered fractional by the meander* line of such lake or lakes * * *." (Italics ours.)

While we have held that Blue lake is not a navigable body of water in the sense that title to the bed thereof would pass to the state upon admission to the Union, it is navigable in a qualified or limited sense. This court has long ago departed from the narrow common-law rule for the determination of the navigability of streams. Under the English common law, streams on which the tide ebbed and flowed were prima facie navigable and the beds thereof were owned by the Crown. All streams or bodies of water not affected by the tide were non-navigable and the adjacent landowners held to the center of the stream or lake. Under this rule many of the large lakes were privately owned and the public generally was deprived of their use and enjoyment. This test for the determination of the navigability of streams, however, was not adapted to the conditions in this country where many large rivers and other bodies of water were susceptible of being used as highways of commerce. Hence the common law test, in the great majority of states, has been either repudiated or modified.

In the well-considered case of *Guilliams v. Beaver Lake Club*, 90 Or. 13 (175 P. 437), the following classification of streams and other bodies of water was made:

"(1) Those in which the tide ebbs and flows, which are technically denominated navigable, in which class

the sovereign is the owner of the soil constituting the bed of the stream, and all right to it belongs exclusively to the public. (2) Those which are navigable in fact for boats, vessels or lighters. In these the public has an easement for the purposes of navigation and commerce, they being deemed public highways for such purposes, although the title to the soil constituting their bed remains in the adjacent owner, subject to the superior right of the public to use the water for the purposes of transportation and trade. (3) The streams which are so small and shallow that they are not navigable for any purpose, the public has no right to whatever. (4) To this list may be added our larger rivers susceptible of a great volume of commerce where the title to the bed of the stream remains in the state for the benefit of the public.''

We think Blue lake comes within the above second classification where title to the bed is in the adjacent owners, subject however to the superior right of the public to use the water for the purposes of commerce and transportation. ''Commerce'' has a broad and comprehensive meaning. It is not limited to navigation for pecuniary profit. A boat used for the transportation of pleasure-seeking passengers is, in a legal sense, as much engaged in commerce as is a vessel transporting a shipment of lumber. There are hundreds of similar beautiful, small inland lakes in this state well adapted for recreational purposes, but which will never be used as highways of commerce in the ordinary acceptation of such terms. As stated in *Lamprey v. State,* 52 Minn. 181 (53 N. W. 1139, 38 Am. St. Rep. 541, 18 L. R. A. 670), quoted with approval in *Guilliams v. Beaver Lake Club,* supra, ''To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated.'' Regardless of the owner-

ship of the bed, the public has the paramount right to the use of the waters of the lake for the purpose of transportation and commerce.

The judgment of the lower court is affirmed.

CAMPBELL, C. J., and ROSSMAN and KELLY, JJ., concur.