**UNITED STATES v. OTLEY et al.**

No. 9677.

District Court, D. Oregon.

Jan. 8, 1940.

J. Mason Dillard, Asst. U. S. Atty., of Portland, Or., Benjamin Catchings, Senior Atty., United States Department of Agriculture, of Washington, D. C., and Hugh L. Biggs, Sp. Atty., United States Department of Agriculture, of Portland, Or., for plaintiff.

J. W. McCulloch, of Portland, Or., Robert M. Duncan, of Burns, Or., and Joseph McKeown, of Marshfield, Or., for defendants.

JAMES ALGER FEE, District Judge. The United States seeks to quiet title to certain lands lying within a meander line run by John H. Neal, defining Malheur Lake, against certain patentees of

184

land lying above and touching this line and against certain other persons who have occupied lands within this line. In a previous controversy between the general government and the State of Oregon it was determined that this body of water is unnavigable, and that Oregon owns no property within this meander line. The rights of private claimants to property rights within the line were specifically reserved for future determination. United States v. Oregon, 295 U.S. 1, 12, 55 S.Ct. 610, 79 L.Ed. 1267. This suit was brought to settle the questions thus reserved.

■ Since grants of the general government are to be construed, the intention evinced by its acts, laws and declarations in the light of all the surrounding circumstances must be found.[1] The establishment of a meander line under the direction of the Land Department shows a belief that there was a body of water of a permanent character.

■ A meander line follows the contour of such a body at mean high water in general outline, with disregard for elevations and slight variations of the shore, to set off a body of upland for which the United States may receive payment from patentees.[2]

■ The existence of a permanent body of water is an essential to a proper meander line. The water found in the Malheur Lake Division has been designated as Malheur Lake since the earliest exploration of that region, in documents, maps and surveys. It has been called a swamp or marsh.[3] Scientifically, it is a playa or the flat-floored bottom of an undrained desert basin or shallow lake. For a proper decision, these designations must not be permitted to tryrannize over the actualities. The conditions themselves must be squared with the legal concepts.

■ From the Rocky Mountains to the Cascades lies a region of which Malheur Lake Division is a part, which is

desert in character. The whole area has experienced irregular cycles of wet and dry years in historic times. A detailed study of the tree rings in Great Salt Lake area in the basin of the Columbia River to approximately 1300[4] and in the Malheur vicinity until 1735 have projected this experience into the past. Studies of geology, precipitation, evaporation and plant growth reinforce the conclusions and establish an essential correlation over the entire region. The quantity and flow of water in the Malheur Lake Division has been governed by the climatic conditions, modified locally. It is important to note that such conditions have not varied essentially in progression since Oregon was admitted to the Union, since observations were made upon the visits by Antoine Sylvaille and Peter Skene Ogden in 1825, nor even for hundreds of years before. The scientific data proves there has been more or less water in the basin during this time. Generally, there has been a lake.

The whole interior region has been undergoing a periodic dry cycle and the Columbia River and other bodies of water have been extremely low since 1928. The Malheur Lake Division was dry in 1931. But it is interesting to note that 1894, the memorable flood year of the Columbia River, probably also set a high water mark on Malheur Lake. In wet years the lake may cover over 60,000 acres and its contour would then measure over 80 miles. It is fed by living streams, the Silvies on the north and the Donner und Blitzen on the south, with an outlet through The Narrows. Even in the dry years, except 1931, it has been a considerable body of water and if the wet cycle recur, as the scientific data indicate, there may again appear a great sheet of water sixteen miles long by six in the broadest dimension.

This evidence leads the court to conclude that there was at the time of the survey,[5] and still is, a permanent[6] body

[1] State of Oklahoma v. Texas, 258 U. S. 574, 594, 596, 42 S.Ct. 406, 66 L.Ed. 771.

[2] Mitchell v. Smale, 140 U.S. 406, 413, 11 S.Ct. 819, 35 L.Ed. 442.

[3] United States v. Oregon, supra, 295 U.S. pages 23, 24, 55 S.Ct. 610, 79 L. Ed. 1267.

[4] Judicial notice taken.

[5] "at the time the survey was made". Lee Wilson & Co. v. United States, 245

U.S. 24, 28, 38 S.Ct. 21, 22, 62 L.Ed. 128. "At the time of the survey". French-Glenn Livestock Co. v. Springer, 185 U.S. 47, 54, 22 S.Ct. 563, 565, 46 L. Ed. 800. "At the time of the survey". Chapman & Dewey Lumber Co. v. St. Francis Levee District, 232 U.S. 186, 195, 34 S.Ct. 297, 298, 58 L.Ed. 564.

[6] "Permanent" is a relative term. See Texas & Pacific R. Co. v. City of Marshall, 136 U.S. 393, 402, 10 S.Ct. 846, 34

of water in the Malheur Lake Division which is called Malheur Lake.[7] Opinions predicated upon the fact that no permanent body of water could be found within a meander line are thus distinguished.[8] Since such a lake existed, a proper meander line could be drawn.

■ A meander line properly drawn must bear some relation to the shape of the lake.[9] But it is the shape of the lake at mean high water which governs. An extremely difficult task was here presented for the surveyor. The whole area where untouched by water is desert in character and bears only sage-brush, greasewood, cacti and sand flowers. But the lands if watered are extremely fertile, especially where peat beds have developed. In its natural state growths of tules, rushes and water grasses covered the basin and fine tendril-like weeds covered the open water. Malheur Lake is like the Nile, for in the desert country fertility follows its overflow. The bed of the lake, where water stands almost continuously, will raise ordinary agricultural crops, if it become dry. In 1931 when there was practically no water there a crop of grain was raised, partially below the 4090 foot contour. Conditions are thus entirely reversed from those prevailing upon lakes not subject to great rises and in fertile country. There, the bed of the lake will not raise agricultural crops while the surrounding country does.[10] The criticism of the Neal Meander upon precedents based upon utterly different conditions is unsound when applied to this peculiar situation. It is true the line in question generally does not mark any bank on the ground nor any change in the vegetation. The Meldrum line generally delineated the high ground and divided desert and agricultural lands. But the United States abandoned this line and surveyed a new one.

■ The flatness of the terrain raised another difficulty. A seven foot rise of water in the lake marks the distinction between a small pool covering about 30

---

L.Ed. 385; Soule v. Soule, 4 Cal.App. 97, 105, 87 P. 205; Haase v. Kingston Ass'n, 212 Wis. 585, 587, 250 N.W. 444. Again, the use of words should not control the facts. The verbal distinction is carried out in the opinions. South Florida Farms Co. v. Goodno, 84 Fla. 532, 542, 544, 94 So. 672. Each court is required to decide from the particular facts whether the body of water was "permanent".

[7] " * * * Malheur Lake has never been known to disappear * * *." Jessup Report, Plaintiff's Exhibit 52, page 39. The government experts admitted on trial that there was a lake in the region, but confined its area to 4090. The testimony in French-Glenn Livestock Co. v. Springer, 35 Or. 312, 58 P. 102; Id., 185 U.S. 47, 22 S.Ct. 563, 46 L.Ed. 800, conclusively proved there was a lake in the vicinity but the jury may have found that plaintiff's land did not touch the water. See also 16 L.D. 256; 19 L.D. 439.

[8] Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 127, 44 L.Ed. 171, meander line held erroneous because land "not permanently covered with water". Here the surveyor himself marked the area as "flag marsh" and "impassable marsh and water". The evidence showed it was a casual body of water. In South Florida Farms v. Goodno, supra [84 Fla. 532, 94 So. 673], the surveyor noted the area as "impracticable sawgrass marsh". The evidence proved there was a temporary overflow. Lee Wilson & Co. v. United States, supra, 245 U.S. page 28, 38 S.Ct. 21, 22, 62 L.Ed. 128, "There was no lake to meander". Chapman & Dewey Lumber Co. v. St. Francis Levee District, supra, 232 U.S. page 195, 34 S.Ct. 297, 298, 58 L.Ed. 564, "was not a lake or permanent body of water, but only temporarily overflowed". In Producers' Oil Co. v. Hanzen, 238 U.S. 325, 334, 335, 35 S.Ct. 755, 758, 59 L.Ed. 1330, the survey notes show "spur of marsh extends out North". "No body of water existed or exists at or near the place indicated on the plat", Jeems Bayou Fishing & Hunting Club v. United States, 260 U.S. 561, 562, 43 S.Ct. 205, 206, 67 L.Ed. 402.

[9] Wide variations might still be overlooked if there were a conscientious attempt to arrive at a correct result. St. Paul & P. Railroad Co. v. Schurmeier, 7 Wall. 272, 74 U.S. 272, 284, 19 L.Ed. 74. Opinions often use variations as a badge of fraud. See Note 18, infra.

[10] The vegetation test is apparently based on Howard v. Ingersoll, 13 How. 381, 14 L.Ed. 189, which relates to an entirely different matter. See also dictum in Harrison v. Fite, 8 Cir., 148 F. 781, 783.

acres and a sheet of water expanding over 60,000. The lake is of a different conformation not only at every different level of a foot but at every inch. At 4090 it is almost circular. From 4092 to 4095 it is of an irregular eliptical shape. The Jessup report indicates that even in high water the level has never risen above 4095, but at times the water probably spread as far as the town of Lawen. At various levels more or less ground is exposed. Suffice it to say, that at 4093 there are 7991.6 acres thus exposed, at 4094, there are 1396.75 and at 4095 only a few high points. It is of course miles from the meander line to the water surface when the lake is very low, but this circumstance under the conditions is not a badge of fraud.[11] Any one who has seen the vast stretches between mean high and low water on the Columbia River would not be astonished at this feature.[12]

Wherever the meander line was drawn, here, at every recession of the water more land would appear next to the line or separated by water a few inches deep.[13] The designation of these as "promontories" and "islands" verges upon absurdity. If the meander line approximately bounded the lake at mean high in this flat country this result is inevitable. There are scattering high ridges and points, which are probably never covered with water, which are properly called "islands". There are none which could properly be called "promontories", which are "high points of land or rock jutting into the *sea,* or headlands". The use of this term to characterize a few square feet of soil arising from an inch or so to two feet above the assumed level of the Neal line is certainly improper. Neal is not to be criticized because he con-

quered this difficult problem created by the conditions he found.[14]

The Neal line was not run on any level of the water. The elevations vary from below 4092 to above 4094. But it is not required that such a line be at a specified elevation. If properly laid, such a line usually will not be level. The Jessup report indicates that high flood stage was somewhat under 4095.[15] The accompanying exhibit shows a water chart where in the available years the water is often shown as rising above 4094.[16] While the Jessup report indicates that at some time the water may have reached the town of Lawen,[17] it must be assumed this was under exceptional circumstances. Yet the fluctuations caused by evaporation and absorption as well as discharge are very great, and are not entirely accurately reflected at The Narrows, owing to the shoal imposed north of the Sod House. Even if Neal drew the meander somewhat beyond the exact line touched by ordinary high water, the government was the gainer and the patentees simply paid slightly more for land which might be covered for long periods of time in wet years.

The fact that there is no definite boundary line between agricultural lands and lake bed, the fact that it is at times miles from the line to the water of the lake, the fact that vast stretches of land attached to or separated from the uplands appeared at various stages of the water, constitute no valid criticism. The actual conditions on Malheur Lake can not be measured by the ordinary standard. But the line drawn met the essential test. Neal's line certainly bounded the shore line of a lake existing at time of survey at mean high water, whether that be as-

11 Compare Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68; Security Land & Exploration Co. v. Burns, 193 U.S. 167, 24 S.Ct. 425, 48 L.Ed. 662; Chapman & Dewey Lumber Co. v. St. Francis Levee District, supra.

12 The United States has taken full advantage of this situation under instructions of this court in the condemnation of lands flowed by the Bonneville Dam.

13 This situation is not comparable to Horne v. Smith, supra, where there was a meander line run upon a bayou, and several hundred acres left unsurveyed on

an elevation between the bayou and Indian River.

14 A case with some features very like the one at bar is Work v. Beachland Development Co., 57 App.D.C. 225, 19 F.2d 699.

15 These elevations were taken at The Narrows. The level of the lake is shown to be .05 above these data.

16 This exhibit shows that the water rose above 4093 every year when records were kept from 1903 to 1922, inclusive.

17 See Plaintiff's Exhibit 52, page 39.

sumed at 4093 or 4094. The result is that there was no gross error or fraud[18] in his work.[19]

In order to discover the intention of the United States at the time the meander line was drawn and patents issued thereon, it is necessary to review the history in the light of the conditions existing on Malheur Lake above outlined. In 1877 the government had a meander line established upon Malheur Lake by John W. Meldrum. This line does outline the lake. Its elevation from inspection must be approximately contour 4098. The court is not prepared to say from the evidence that the Meldrum line was not a proper meander line of the lake. There are some portions of the line which the court believes have been crossed by water in the period prior to 1922. However, the French-Glenn Livestock Company, one of the patentees on the Meldrum line, attempted to bring ejectment against a squatter below. The case was tried before a Harney County jury and a verdict was found for the defendant. The Supreme Court of the State of Oregon [20] and the Supreme Court of the United States affirmed.[21] Technically speaking, the question arose upon the correctness of instructions of the trial court[20] submitting the question of whether the property of plaintiff bordered on a proper meander line at that point.[22] But the case seems to have been popularly accepted to have established *the fact* that there was no lake in front of the French-Glenn property. The jury might well have been as much influenced by the testimony that Peter French, the president of the company, had encouraged the defendant to settle on the lands in front of the meander line. Feeling was high in this frontier country between the large land owners and the rugged individualist who had no property but demanded his place in the sun. It is a matter of history of which the court may take judicial knowledge that Peter French was killed at a subsequent period by a squatter upon lands which the French-Glenn Livestock Company claimed, and that his slayer was acquitted by a Harney County jury.[23] The community sentiment and particularly that of the settlers on the bed who were not patentees was tinctured by the feeling which existed in most Western communities that the land belonged to the occupant or the first taker, who could make use thereof, and that any interference with these inalienable rights either by the land owner or the government was a destruction of the personal liberty of the settler, and an example of bureaucratic tyranny and special privilege. This feeling characterizes all of the history and the litigation over the Malheur basin.

After the decision of the French-Glenn Livestock Company case, the Land Department was still convinced that a lake existed in the territory, for the drawing of a second meander line at mean high water and a survey of all the lands between the Meldrum line and the actual shore line of the lake was directed.

---

[18] Most of the opinions cited by the United States depend upon fraud. In Security Land & Exploration Co. v. Burns, supra, a case of fraudulent meander line, the surveyor had never been on the ground. There the marks of high and low water were established to be shown on the soil a great distance from the meander line which was treated as a boundary. "There never was, in fact, an attempt to survey the land in controversy." Jeems Bayou Fishing & Hunting Club et al. v. United States, supra. " 'It is admitted by both parties that the land in controversy is high land, and was high land at the date that Bristol made his survey in 1871' ". Producers Oil Co. v. Hanzen, supra, 238 U.S. page 337, 35 S.Ct. 755, page 759, 59 L.Ed. 1330. "In this case no survey was in fact made, no meander line was in fact run, and no body of water in fact existed near the false meander line indicated". Kirwan v. Murphy, 189 U.S. 35, 43, 53, 23 S. Ct. 599, 603, 47 L.Ed. 698. . See Lee Wilson & Co. v. United States, supra.

[19] Producers' Oil Co. v. Hanzen, supra, which outlines the general rule and the exceptions.

[20] 35 Or. 312, 58 P. 102.

[21] 185 U.S. 47, 22 S.Ct. 563, 46 L.Ed. 800.

[22] " * * * if there was a lake abutting on or to the north of the lots, the plaintiff in error would take all land between the meander line and the water * * * ". French-Glenn Livestock Co. v. Springer, supra, 185 U.S. page 54, 22 S. Ct. 563, page 566, 46 L.Ed. 800.

[23] "Whenever a man hits another man with a horsewhip he needs killing." United States v. Oregon, supra, Joint Abstract of Record, Volume I, page 52.

This survey was made by John H. Neal in 1895. His instructions are carefully detailed,[24] and direct the establishment of a meander line at "mean high" of the lake, in accordance with the congressional enactment of the surveyor's manual and existing law and regulations. The government has severely criticized the Neal line, but the court finds it to be meticulously careful[25] and that the criticisms made by the cadastral engineers of the government, based upon surveys made in 1931 after almost forty years had elapsed, tend rather to support than to destroy this conclusion.[26] It must be remembered that these later surveys were made for the purpose of building up the government's case[27] in this litigation, and at this point the court cannot but call attention to the failure of the government to call Neal as a witness either before the Master when Neal was actually present at the hearings or by preservation of his testimony for this court.[28] It would seem too clear for comment that the recollections of this trained expert, who, drew a line with the statements of the court invalidating the Meldrum line before him, would have been of immense value in allowing this tribunal to have arrived at a proper conclusion as to conditions then. The court must assume that his testimony would have been contrary to the present contention of the government. It seems fairly obvious that the quest was not for truth but for victory.

In the previous year of 1894, the waters of Malheur Lake were extremely high considering what they have been in the last ten years. It is probable that in years previous to 1894 they had been even higher for short periods of time. The court is firmly convinced that Neal carefully and conscientiously fixed a line between extreme high water and the ordinary level of the lake at that time.[29] There was, of course, no fraud, and in the opinion of the court there was no error. The court finds as a fact that at the time of the survey and now there is a lake.

■ The attempt now is to find the intention then. The Land Department was carrying out the congressional policy of settling the barren lands of the West.[30] The officials yielded to the clamor of the squatters reinforced by the French-Glenn decision and ordered the establishment of a new line. Notwithstanding the knowledge that this meander ran through or above fields periodically submerged for which the settlers were seeking patents,[31] the Department confirmed this line and the survey of uplands to this line only.[32] The officials therefore knew of the so-called "fast

---

[24] "You will carefully define the present shore line of Malheur Lake by running a new meander line in accordance with requirements found on Pages 56, 57 and 58 of the Manual of 1894." Joint Abstract of Record, United States v. Oregon, supra, Volume I, page 177.

"You are therefore instructed to establish a new meander line at *mean high* water mark. The Honorable Secretary of the Interior in this case permits the survey of all *dry land* between the meander line and shore line, and nothing in his decision contemplates a departure from the *regular* method of meandering shores." Joint Abstract of Record, United States v. Oregon, supra, Volume I, page 177.

[25] The contemporary record, the field notes, certify to each corner on the meander line "mean high water mark of Malheur Lake". He also places a certificate following the notes on each township similar to the following:

"In executing my contract of survey, I have extended the lines of survey to the mean high water mark of Malheur Lake to the best of my knowledge and belief".

This is a showing of good faith and entirely distinguishes the cases based on fraud. See Note 18, supra.

[26] The special master appointed by the Supreme Court has found the Neal line a proper meander of Lake Malheur, and the finding was approved by the court. United States v. Oregon, supra. However, the finding was expressly not binding upon the patentees and the evidence has been re-examined in the light of the present record.

[27] The United States could not by a resurvey destroy the rights of a patentee. United States v. State Investment Co., 264 U.S. 206, 212, 44 S.Ct. 289, 68 L. Ed. 639. The present procedure is analogous to a re-survey.

[28] Neal had died before the trial of the present case.

[29] Neal was a local man and knew the peculiar conditions. Record, page 457.

[30] In ordering the survey the Secretary of the Interior accepted the doctrine of Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428, as applicable. Defendants' Exhibit X-13.

[31] Plaintiff's Exhibit 71.

[32] " * * * great confusion and litigation would ensue if the judicial tribunals,

lands", "islands" and "promontories". The intention to find all the area within the meanderline was subject to overflow at mean high water is apparent. No one knows today what Neal and the Department officials considered the level of mean high water. It is an error to attempt to deduce an average mean high by taking the estimated level of the Neal line over thirty years later. Neal and the Department assumed that the water itself was the boundary. It would be improper now to metamorphize this purpose, by projection back of insufficient data to find a water level which was not established or contemplated at the time.[27]

The master in the case of United States v. Oregon, supra, found that "fast lands" which projected even infinitesimally over the elevation of 4093 were not a part of the permanent lake bed.[33] This is based on Jessup's Report, which states that "in order to *maintain*[34] a mean average elevation of this lake surface much above 4093 feet would require more water than has ever been available". No problem of intention was there to be considered. If the areas were not lake bed, they did not pass to the State of Oregon, under its own contention.

Here the problem for determination is entirely different. The intention of the United States is cardinal. Since Neal did not survey any lands below the meander line, whether as "fast lands" or "islands", he made an administrative determination, accepted and approved by the Land Department, that there were no lands whether "fast lands", "promontories" or "islands" within that line, which had characteristics which would permit them to be the basis of entry or homestead.[35] This did not require a determination of the elevation of the water at "mean high". Neal took no levels and made no such finding. It is true, however, that there are certain points of land in the bed of the lake which were never covered with water at any time.

The government proceeded to patent the lands between the Meldrum and Neal lines.[36] Many of the patented lands bordered upon the Neal line. These patents contained no reservations,[37] which could easily have been inserted if that intention had been present.[38] Thereafter,

state and federal, were permitted to interfere and overthrow the public surveys on no other ground than an opinion that they could have the work in the field better done, and divisions more equitably made, than the department of public lands could do." Haydel v. Dufresne, 17 How. 23, 58 U.S. 23, 30, 15 L.Ed. 115.

[33] If the lake bed had belonged to the State of Oregon, the islands would have belonged to the United States and not to the patentees. Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L. R.A.,N.S., 107.

[34] Emphasis supplied.

[35] This indicates that there were no islands worthy of survey. "We have no doubt, upon the evidence, that the circumstances were such at the time of the survey as naturally induced the surveyor to decline to survey this particular spot as an island." Grand Rapids & Indiana Railroad Co. v. Butler, 159 U.S. 87, 95, 15 S.Ct. 991, 994, 40 L.Ed. 85. See Bransfield v. Wallace, 195 Mich. 41, 162 N.W. 73.

[36] The intention of the officials with knowledge is clearly indicated. The direction to survey, 16 L.D. 256, March 3, 1893, the selection of a plan of survey, 19 L.D. 439, December 3, 1894, recognize

the problem of "swamp lands", the shoreline of the lake, the riparian rights of patentees and direct a solution by survey of lands between the previous meander and the "shore line". It is quite clear that the Secretary of the Interior acted with full knowledge that the meander line so established would carry rights within. "By decision of the Supreme Court of the State of Oregon in the case of Minto v. Delancy, 7 Or. 337, the common law rule is applied to non-navigable lakes in that state; hence owners of land upon Lake Malheur having riparian rights take to the center of the lake, or ratably, as the circumstances of the case may determine." Defendants' Exhibit X–13. The whole exhibit is extremely important as to intention.

[37] It is true that special circumstances may negative the intention to grant riparian rights with upland bounded on a meander line. Producers' Oil Co. v. Hanzen, supra.

[38] Patents in the particular form carry the incidents of common law riparian ownership unless the law of the particular states be otherwise. Hardin v. Jordan, supra; Mitchell v. Smale, 140 U.S. 406, 11 S.Ct. 819, 35 L.Ed. 442; State of Oklahoma v. Texas, supra; Brewer-El-

although the Land Department recognized the doctrine that swamps are to be treated as dry lands[39] and that unsurveyed islands omitted by mistake may be the subject of entry, the officials permitted no homestead entry on lands within the meander line on either "islands" or "fast lands". The theory was entertained that the grantee of the upland had some rights in the bed even to the center,[40] under the laws of the State of Oregon.[41] Of course, no estoppel runs by virtue of the acts of public officials, against the government.[42] But this administrative body was charged with the disposal of public lands according to statute and determinations by them founded upon facts here found to exist at the time of survey[43] and without fraud or gross error establish constructions which should be recognized and upheld.[44]

This conclusion is reinforced by the arid conditions of the territory and the fact that the lake itself and the presence of water gave whatever value there was to lands on the border,[45] and that when the waters retreated, use of the overflowed lands was necessary to the landowner. The business of the early settlers was raising stock, and the pasture and hay within the meander line were the only things which rendered the patented lands tenable in the years of drouth. If the water did not come onto the patented lands, it was still necessary that the patentee should find some place to pasture his cattle and cut hay for them. The conditions, therefore, dictated that the patentee be given some rights in the bed of the lake.[46]

The United States was at the time Oregon was admitted to the Union and at the date the first patent was issued the owner of the bed of the lake and all the circumadjacent territory.[47] It could convey part or all. What was not granted still is retained.

The court simply finds that the United States intended to convey to the patentees that to which they were entitled by the law of the state.[48] The reservation of certain high points, certainly those which were not directly in front of patented lands, was intended. The United States has still whatever rights it then retained in the bed and such high points. Unless the law of Oregon is that a particular right passed to the grantee, then the United States still retains all.

■ Moreover, the meander line owners would include those whose patents is-

liott Oil & Gas Co. et al. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140.

39 "Meander lines will not be established at the segregation line between dry and swamp or overflowed lands, but at ordinary high water mark of the actual margin of the river or lake upon which the swamp or overflow lands border." Joint Abstract of Record, Volume I, page 181, paragraph 4.

40 "Owners of land upon Lake Malheur having riparian rights take to the center of the lake or ratably." 19 L.D. 439; "including unsurveyed islands". Grand Rapids & Indiana Ry. v. Butler, supra.

41 The law of Oregon is established in this particular. Luscher v. Reynolds et al., 153 Or. 625, 56 P.2d 1158.

42 Lee Wilson & Co. v. United States, supra; Utah Power & Light Co. v. United States, 243 U.S. 389, 408, 37 S.Ct. 387, 61 L.Ed. 791. Where the acts were beyond the express terms of the statute or the Land Department did not have jurisdiction these were open to question. Burfenning v. Chicago Ry. Co., 163 U.S. 321, 323, 16 S.Ct. 1018, 41 L.Ed. 175; Borax Co. v. Los Angeles, 296 U.S. 10, 17, 56 S.Ct. 23, 80 L.Ed. 9; Burke v. Southern Pacific R. R. Co., 234 U.S. 669,

34 S.Ct. 907, 58 L.Ed. 1527; Moffat v. United States, 112 U.S. 24, 5 S.Ct. 10, 28 L.Ed. 623; Kirwan v. Murphy, supra; Horne v. Smith, supra.

43 Mitchell v. Smale, supra, 140 U.S. pages 413, 414, 11 S.Ct. 819, 35 L.Ed. 442.

44 Cragin v. Powell, 128 U.S. 691, 9 S. Ct. 203, 32 L.Ed. 566; Russell v. Maxwell Land Co., 158 U.S. 253, 15 S.Ct. 827, 39 L.Ed. 971. See Cameron v. United States, 252 U.S. 450, 464, 40 S.Ct. 410, 64 L.Ed. 659; Haydel v. Dufresne, supra 17 How. page 30, 15 L.Ed. 115.

45 Mitchell v. Smale, supra, 140 U.S. page 412, 11 S.Ct. 819, 35 L.Ed. 442.

46 Work v. Beachland Development Co., supra, 57 App.D.C. 225, 19 F.2d page 701.

47 All rights in this area must be based upon some grant from the United States. Stark v. Starr, 94 U.S. 477, 24 L.Ed. 276.

48 "Subject to the riparian rights of the respective owners abutting on the meander line in accordance with the laws of the several states". See Lee Wilson & Co. v. United States, supra. The intention of the grant is a federal question; the effect is a state rule of property. United States v. Oregon, supra, 295 U.S. page 28, 55 S.Ct. 610, 79 L.Ed. 1267.

sued after 1908 and based on an entry initiated prior thereto. The executive order saved existing rights. Congress and not the President have the power to dispose of public lands. The rights were initiated under valid legislation and the patents then carried whatever rights would have been carried if the executive order had not been issued.[49]

The present position of the government is therefore anachronistic. It is an attempt to read the intention of 1930–9 into acts done in 1895–1904. The congressional policy of that time was expressed in the homestead acts. The executive order of 1908 protected "existing rights" and the Land Department construed this phrase to permit the issuance of patents upon similar terms, without reservations and confirming pre-existing entries. Fractions of the upland bordering the meander line and reserved by the executive order were granted away under this clause. Since the reservation of these fractions was to prevent the proprietors of the uplands from reaching the meander line and thus specifically designed to prevent the creation of riparian rights, the Land Department was carrying out the law as then laid down. It is also evidence that the officials intended riparian rights to pass, even at that time. No further entries have been validated which were attempted after that date. A further administrative construction of the law was thus given. Since the executive order was issued, the agencies of the government have consistently carried forward the announced design. No one will doubt at present that the conservation of migratory wild life is an appropriate national purpose. But the concept has had an evolutionary development. In 1895, when the meander line was run, the Congress, the Executive and the departments were all still imbued with the purpose of settling the western desert through the homestead laws. It is a fact well authenticated that although conservation of national resources had been present in the minds of many persons at that time, no serious move to adopt it as a governmental policy had then been made. When the executive department actually commenced withdrawals of government land to subserve that purpose a controversy was precipitated which raged for years, involving constitutional, economic and politic arguments and tendencies.

But that controversy related generally to the conservation of the resources of the lands themselves. It was a further step to apply the doctrine to migratory wild fowl.[50] The ancient doctrine of the common law indicated that the individual states rather than the United States were the conservators of wild game within their respective boundaries.[51]

In 1906 the Congress enacted a statute which definitely initiated a new policy. The executive department in 1908 promulgated the withdrawal order. But progress was slow and moves guarded. The first Migratory Bird Act of 1913, 37 Stat. 847, was declared unconstitutional. The Migratory Bird Act of 1918, 40 Stat. 755, 16 U.S.C.A. § 703 et seq. and the opinion of the Supreme Court of the United States sustaining the exercise of power to enforce a treaty first placed this new policy upon a firm foundation.[52] Thereafter and until the present time, increasing impetus has been given by the studies as to the habits of the birds, the realization of the unique situation of Malheur Lake as a refuge and the necessity of active measures, because of the failing numbers of the wild fowl, due to previously unsupervised hunting and the incidence of botulism caused by the failure of the water supply in breeding grounds.

The result has properly been an extremely active supervision and control of Malheur Lake by the United States.[53]

[49] Stockley v. United States, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390; Cornelius v. Kessel, 128 U.S. 456, 9 S.Ct. 122, 32 L.Ed. 482; State of Oklahoma v. Texas, supra, 258 U.S. pages 596, 597, 42 S.Ct. 406, 66 L.Ed. 771; Stark v. Starr, supra; 16 L.D. 256; 19 L.D. 439, supra.

[50] See 16 U.S.C.A. § 701, passed in 1900, which was the first act suggesting the purpose but without specific detail and without withdrawal of public land.

[51] Geer v. Connecticut, 161 U.S. 519, 523–530, 16 S.Ct. 600, 40 L.Ed. 793, and see argument of appellant set out in Missouri v. Holland, 252 U.S. 416, at pages 417–424, 40 S.Ct. 382, 64 L.Ed. 641, 11 A.L.R. 984.

[52] Missouri v. Holland, supra.

[53] See United States v. Oregon, supra, 295 U.S. page 25, 55 S.Ct. 610, 79 L.Ed. 1267.

The hostility of some of the occupants of the land and the interference of the State of Oregon has created a desire to free these activities from the limitations thus created. This is right and proper, and the steps taken are constitutionally and legally sound.

But the court should not distort history nor read into the acts done by the Land Department pursuant to the laws of Congress a different purpose or idea than that which actually characterized them.

At the date of the executive order of 1908 the United States held all the rights which were not granted to patentees and entrymen. The executive order making a withdrawal was valid and the United States still has the rights it had then.[54] For various reasons these residuary rights were not clearly outlined. The problems which confront the court now were even more apparent then. If the lake were cut into separate parcels, some basic principle would have to be adopted.[55] The question of where the center of the lake was, the question of whether lines should run to the edge of water or straight out across the area were obvious to all. There are three sections of the lake as to which different rules might be applicable, namely the section east of Cole Islands,[56] the center section and the section west of a line drawn north through the Sod House.[57] There are three deep spots in various sections of the lake. Should the boundaries run to a point or to a line as the center? If so, the place where the line should be drawn or the location of the point was doubtful. The State of Oregon increased the confusion eventually by claiming title to the bed of the lake. The law of Oregon indicated that the riparian owner took to the center of the lake but lacked complete clarification as to details of the proper method of division and of the allocation of islands. No islands had been surveyed and the level of mean high water in the lake is even today subject to doubt.

The "settlers" within the meander line who were not patentees attempted to force the United States to change the policy, but this failed. The employees of the Interior Department began administration of the area in 1908. They did not drive the "settlers" off the lake bed. If they had, political pressure might have been exerted and there was a possibility that the reservation might be abolished. These "settlers" were on the lake and were claiming adversely to the government, not to the patentees of the uplands. If the government had granted away all the lands touching the meander, it would have had nothing more to grant. As it was, no rights accrued against the United States in the area after the date of the executive order. The order closed all the basin to entry within the line drawn. The government had certain rights of ownership within the lines, but the limits of its property had not been defined. The court finds the United States cannot be deprived of these rights, by entry not according to law on lands which were by congressional action declared a bird reserve, by application of the doctrine of prescription against the patentees on the border, and in accordance with a scheme of cutting up the lake developed on paper thirty years later.

The patentees did not attempt apparently to enforce the method of division now developed. They did not erect fences on the lines now claimed. Apparently each chose an area within the line which was most convenient to feed stock or cut hay. Whether this field was in front of his patented lands or elsewhere seems to have been entirely fortuitous. The claims by prescription could never have been built up if the patentees had been acting on the theory now presented. But none of them knew the exact definition of his rights, of the rights of the United States which was administering the area under the executive order, of the rights of the state which was claiming the whole bed, of the rights of his neighbors or of the

---

[54] United States v. Midwest Oil Co., 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673.

[55] See William Erickson, 50 L.D. 281, 284.

[56] Not usually covered by water, except when lake was 4093 or by wind action.

[57] Water seeped under this but did not flow over the top of the ground until 4092 at least was reached. If The Narrows is a stream this section might be so treated.

The Supreme Court of the United States has already upheld the riparian rights of the grantees upon the border of The Narrows upon the theory that this is a stream. But no water gets into The Narrows except by passing through the section of the lake.

"settlers". Besides, over all fell the shaddow of French-Glenn Livestock Co. v. Springer, supra. The landowner did not wish to take the chance that a jury might find there was no lake in front of his premises and thereby lose all his rights.

The land, moreover, was apparently administered by the United States as if it had an ownership in common with the patentees. Such an idea is not entirely without the scope of equitable considerations. In fact, the principle has been adopted as to non-navigable streams by the statutes of 1796.[58]

■ The court, therefore, determines that the meander line was properly drawn, that the United States intended the patentees to have such rights in the bed as accrued to an upland owner under the law of Oregon, that the United States retained all land and rights not so specifically granted, that pending division the lands were administered by the United States in common and were so treated by the landowners; that no outsider could, pending the division of these lands, acquire rights therein against the United States.

■ The only remaining question of fact is the drawing of lines between property of the patentees and the United States. Under all the circumstances equitable considerations must prevail.[59] The court rejects the theory of the defendants, since no provision is made for riparian rights of lands on the eastern border owned by the United States.[60] The court likewise rejects the theory that the United States owns the entire lake bed and the alternative theory that the United States owns all the lands above 4093. No other theory has been developed. The court, therefore, reserves that field which may be outlined after counsel have oriented themselves with the landmarks already laid down.

Here all concerned may well adopt a realistic approach. The United States, as every one knows, has declared the whole territory a bird refuge and has been administering it as such for many years. The government will acquire these lands either by force of the reserved ownership or by purchase or by condemnation. The patentees acquired rights here pursuant to the original governmental purpose of developing the uninhabited West and all its resources. Malheur Lake has now been proved to be a unique area. It holds a peculiar position on the flyways of the decimated flocks of wild fowl. It is a proper governmental purpose to save the feathered visitors from the fate to which American carelessness doomed the passenger pigeon. The ultimate question, then, is how much the United States should pay the individual patentee for rights which were acquired when he settled on a tract of land, pursuant to congressional authorization, and endured the hardships of a pioneer to reduce a wild country to a state of civilization. In this view of the case, the individual boundary is of less importance than an equitable adjustment of the rights of the landowners and the government. In this, the possibility of the recurrence of high water levels may be considered, for although a party may own land to the center of the lake, it would be of little value if continuously covered. No problem of accretion is involved, but simply·the value of the rights accruing by virtue of the water bordering on the land and the rights which attend recession.[61] On the other hand, it must be considered that if the water vanished completely, even the patented lands would be desert in character and of little value. If a money judgment could be rendered against the United States and in favor of the patentees it would probably furnish the most acceptable solution, but the pre-trial order does not presently include such an issue.

In this state of the record, since no method of carving up the bed of the lake is suggested which is acceptable and the court cannot outline a method in the absence of further development of an equitable solution, the court directs counsel to add to the record whatever matters they may desire in view of these preliminary determinations.

[58] See St. Paul & P. Railroad Co. v. Schurmeier, supra.

[59] See Columbia Land Co. v. Van Dusen Inv. Co., 50 Or. 59, 91 P. 469, 11 L. R.A.,N.S., 287; "ratably", Luscher v. Reynolds, supra.

[60] See William Erickson, 50 L.D. 281, 284 (February 20, 1924), as to the methods of cutting up lake beds.

[61] Cawlfield v. Smyth, 69 Or. 41, 46, 138 P. 227; French-Glenn Livestock Co. v. Springer, supra.

Three questions remain for answer, if boundaries must be drawn:

Did the law of Oregon at the time patent issued solve the problem of ownership of land entirely above water at all times and within the meander line?

Did the law of Oregon at the time patent issued solve the problem of the method of division of the lake bed?

What is a proper. method of division of the lake, if Oregon had not a definite rule applicable?