**WORK, Secretary of the Interior, et al. v. BEACHLAND DEVELOPMENT CO. et al.**

Court of Appeals of District of Columbia.
Submitted April 7, 1927.   Decided May 2, 1927.

No. 4530.

1. **Public lands** ⊙⟳25—Authority of Secretary of the Interior to determine what constitutes public lands is limited in matter of resurveys and correction of surveys.

Authority of Secretary of the Interior to ascertain and determine what constitutes public lands is subject to limitations, where it involves resurveys and correction of public land surveys, and hence, where the United States has already conveyed lands, the Secretary is without jurisdiction to intermeddle by second survey.

2. **Navigable waters** ⊙⟳37(4)—Claimant of land between river border and survey meander line held entitled thereto, and Secretary of the Interior properly enjoined from making resurvey.

Claimant of strip of land between border of river and meander line of survey as included

in prior grant *held* entitled thereto, and Secretary of Interior properly enjoined from making resurvey and plat of such strip of land.

Appeal from the Supreme Court of the District of Columbia.

Suit for injunction by the Beachland Development Company and another against Hubert Work, Secretary of the Interior, and another. Decree for plaintiffs, and defendants appeal. Affirmed.

O. H. Graves, of Washington, D. C., for appellants.

Lemuel Oliver and F. W. Clements, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. This appeal is from a decree entered in the Supreme Court of the District of Columbia, permanently enjoining the Secretary of the Interior and the Commissioner of the General Land Office from proceeding to make a survey and plat of a strip or tract of land lying between lot 2, section 31, and lots 7 and 8, section 32, Tp. 32 S., R. 40 E., and the Indian river, in the state of Florida.

It appears that in 1859 a government survey was made of township 32, and the plat thereof was duly approved by the department in December, 1859. The plat discloses that the boundary lines of the lots in question border on the Indian river, a navigable stream. The lots were in due course patented by the United States, and are now owned by the appellees.

In 1923, one Walter Kitching settled on a strip of land between the meander line of the survey as shown on the original plat and the Indian river. In 1925 Kitching applied to the General Land Office for the survey of these lands, asserting his claim as a settler on public lands of the United States. Following this request, an official investigation was made in the interest of the Land Department, and the officer making the investigation, after finding that appellant Braswell Realty Company acted in good faith in the purchase of the lands, the title to which reads, "River to ocean, with full riparian rights," reported in part as follows:

"Your examiner believes that the omitted area in this examination is large enough, and the attending physical conditions such, that the department is justified in asserting title to same, and in stipulating that same be surveyed as public land of the United

States. The matter of disposition of the land after survey may have to be based on special investigation by the field service, for the survey protestators, as well as the survey applicant, apparently have established certain rights to the area in question."

The supervisor of surveys, in transmitting the report to the Commissioner of the General Land Office, recommended as follows:

"The configuration of the land, however, is such that I am of the opinion that it should not be considered as public land. Aside from the narrow strips or peninsulas extending into the tidal marsh, the land omitted from the original survey has an average width of approximately 8 chains. Considering the character of surveys originally executed in this vicinity, I am of the opinion that the original meander line through these sections conforms reasonably with the actual shore line, and that these lands should be considered as appurtenant to the surveyed lands in these sections, under the usual doctrine that the shore line and not the meander line forms the boundary. Accordingly I recommend that the application of Walter Kitching for the survey of these lands be denied."

The Commissioner of the General Land Office, in his report to the Secretary of the Interior, recommended in part as follows:

"In my opinion, the failure to include this particular tract of land in the original survey cannot be attributed to error or fraud on the part of the deputy surveyor, but rather that it is the result of the surveying practice being followed at that time. Considering the character of the original surveys in this vicinity, I believe that the original meanders of the Indian river through these sections conform reasonably with the actual shore line. In view of the foregoing, I respectively recommend that the United States do not assert title to the excess lands in sections 31 and 32, Tp. 32 S., R. 40 E., Tal. M., Florida; that the application of Walter Kitching for the survey of said lands be denied; and that the said areas be considered as portions of the adjoining surveyed land under the usual doctrine that the shore line, and not the meander line, forms the boundary of lands disposed of under the plat of the original survey."

Notwithstanding these reports, the Secretary directed a survey to be made, on the ground "that a substantial and valuable area of land in place was omitted from the original survey, and that the title thereto rests in the United States; that title cannot be passed into private ownership, confirmed, and quieted, unless and until the land shall have been surveyed and disposed of under some appropriate public land law."

The method of meandering navigable streams, in the survey of public lands in force in 1859, appears in the manual of instructions as follows:

"The Meandering of Navigable Streams
(Page 523).

"2. Both banks of navigable rivers are to be meandered by taking the courses and distances of their sinuosities, and the same are to be entered in the field book. At those points where either the township or section lines intersect the banks of a navigable stream, *posts,* or, where necessary, *mounds* of *earth* or *stone,* are to be established at the time of running these lines. These are called 'meander corners'; and, in meandering, you are to commence at one of these corners on the township line, *coursing the banks,* and measuring the distance of each course from your commencing corner to the next 'meander corner,' upon the same or another boundary of the same township, carefully noticing your intersection with all intermediate meander corners. By the same method you are to meander the *opposite bank* of the same river."

It appears from the record that the original survey was made with great difficulty; the meander lines being extended between convenient points selected on the banks of the river. In some instances these lines passed over lands in place, and in other instances over water, which extended in from the main shore line. The contract under which this survey was executed embraced certain fractional townships bounded on one side by the Indian river and on the other side by the Atlantic Ocean, described in the contract as "scrap work or unfinished surveys not heretofore surveyed, on account of the difficulty of execution." The lands in the township in question became subject to private entry at $1.25 per acre. They were filed upon and disposed of on this basis, and have remained in private ownership ever since. The conveyances from one owner to another have described the lands as bounded on the one side by the Indian river, and the title to the lands thus described has been asserted by the various owners for over 60 years.

The courts have stated in many cases their understanding of the function of meander lines in surveys of public lands bordering on navigable rivers. In St. Paul & P. Rail-

road Co. v. Schurmeier, 7 Wall. 272, 286 (19 L. Ed. 74), the court said: "Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water course, and not the meander line, as actually run on the land, is the boundary."

A recent cadastral survey discloses that the total amount of land in controversy, lying between the meander line, established by the 1859 survey, and the banks of the river, is 58.50 acres, constituting a narrow strip, with an average width of about 8 chains.

[1] It is the contention of the Secretary that he is vested with sole authority to ascertain and determine what constitutes public lands, what have been surveyed, what have been disposed of, what remain to be disposed of, and what are reserved. Unquestionably he possesses this authority where the determination and investigation relates to public lands of the United States, but in the matter of resurveys, and the correction of public land surveys, this authority is subject to limitations. Where the United States has already conveyed lands, as in the present instance, the Secretary is without jurisdiction "to intermeddle with them in the form of a second survey." Kean v. Calumet Canal Co., 190 U. S. 452, 461, 23 S. Ct. 651, 652 (47 L. Ed. 1134).

This limitation upon the power of the Land Department is further announced- in Cragin v. Powell, 128 U. S. 691, 699, 9 S. Ct. 203, 206 (32 L. Ed. 566) as follows: "It is conceded that this power of supervision and correction by the Commissioner of the General Land Office is subject to necessary and decided limitations. Nor is it denied that, when the Land Department has once made and approved a governmental survey of public lands (the plats, maps, field notes and certificates all having been filed in the proper office), and has sold or disposed of such lands, the courts have power to protect the private rights of a party who has purchased, in good faith, from the government against the interferences or appropriations of corrective resurveys made by that department subsequently to such disposition or sale."

[2] With these principles in mind, we think this case is disposed of conclusively by the opinion in the case of United States v. Lane, 260 U. S. 662, 43 S. Ct. 236, 67 L. Ed. 448, in which the court held that, where certain public lands, designated as lots bordering on a lake, were patented according to a plat showing meander lines established in the original survey, which lines at points covered lands in place and at other points passed over water extending back from the lake, and where the failure to include such lands within the meander lines was not due to fraud or mistake, but was consistent with a reasonably accurate survey, taking into consideration all the circumstances, the area included and excluded, the value of the land at the time of the original survey, and the difficulty of executing the survey at that time, the water formed the legal boundary of the lands patented.

The record in the present case discloses that, when the original survey was made, the lands in question were of little value, and indeed remained so until the recent speculative development in real estate generally throughout the state of Florida; when the appellee corporation purchased the lands with a view of developing a town ·site, the purchase price, in this instance, involved a large consideration. In this respect the analogy between this case and the facts disclosed in United States v. Lane, supra, are very similar. In that case the court said:

"So far as the instant cases are concerned, there is nothing in the circumstances to suggest the conclusion that any fraud was committed or palpable mistake made by Warren [the original surveyor]. At the time of his ·survey the lands were of such little value, the locality so wild and remote, and the attendant difficulties so great, that the expenditure of energy and money necessary to run the lines with minute regard to the sinuosities of the lake would have been quite out of proportion to the gain. We are of opinion that the survey of 1839, except as to the two large tracts just mentioned, is not open to challenge. The precisely accurate survey of 1916–1917 would probably never have been made, but for the greatly increased value of the lands, due to the discovery of oil and gas therein."

The acreage involved in the Lane Case was much larger than that involved in the present case, and it may well be inferred that the present move would never have been made or attempted, on the part of the offi-

cials of the government, had it not been for the townsite development on the lands in question.

In Mitchell v. Smale, 140 U. S. 406, 11 S. Ct. 819, 840, 35 L. Ed. 442, quoted with approval in the Lane Case, supra, the court, expressing its opinion as to the hardships which would arise from enforcing the rule here contended for by the appellees, said:

"We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more nor less than taking from the first grantee a most valuable, and often *the* most valuable, part of his grant. Plenty of speculators will always be found, as such property increases in value, to enter it and deprive the proper owner of its enjoyment; and to place such persons in possession under a new survey and grant, and put the original grantee of the adjoining property to his action of ejectment and plenary proof of his own title, is a cause of vexatious litigation which ought not to be created or sanctioned."

The decree is affirmed, with costs.