50 So.2d 298 (1950)
218 La. 637
SAVAGE et al.
v.
PACKARD et al.
No. 39393.
Supreme Court of Louisiana.
May 29, 1950.
On Rehearing November 6, 1950.
Rehearing Denied December 11, 1950.
Cook, Clark & Egan, Shreveport, for plaintiffs-appellants.
Smith, Hunter, Risinger & Shuey, Shreveport, for defendants-appellees I. R. Packard and Quad Drilling Co.
D. H. Perkins, Shreveport, for Mills Tooke Properties, Inc., Stanley W. Metcalf, and A. G. Thompson.
MOISE, Justice.
Plaintiffs in this suit, Rowland Savage, John Graham Savage and Bill Gary were cast in judgment by the District Court, and they have appealed.
They are the transferees from Mansfield Oil Company, by deed dated May 31, 1946, of the mineral rights in the following described property:"Fractional Southeast Quarter of Southeast Quarter (SE¼ of SE¼), less South 495 feet thereof, Section *299 1, Township 20 N, Range 16 W, Caddo Parish, Louisiana."
This dispute involves the ownership of minerals lying under a strip of land which plaintiffs contend lies within the westernmost limits of the above described property, said strip being described in accordance with their contention as follows:"Beginning at the southwest corner of the land hereinabove described (Fractional Southeast Quarter of Southeast Quarter (SE¼ of SE¼) of said Section 1, less the South 495 feet thereof) run thence South 89 degrees, 37 minutes East 37.27 feet, then North 0 degrees, 39 minutes East 376.94 feet, thence West 37.37 feet, thence South 0 degrees, 38 minutes West 376.94 feet to point of beginning."
A resume of the chain of title of the entire South Half of the Southeast Quarter of Section 1 will facilitate an understanding of the present litigation.
Under date of March 7, 1902, "the South half of the South East fractional quarter of Section one in Township twenty North of Range sixteen West of Louisiana Meridian in Louisiana, containing seventy-three acres and thirty-seven hundredths of an acre according to the Official Plat of the Survey of the said Land, returned to the General Land Office by the Surveyor General" was patented by the United States of America to Wilson More Goodson, who had entered this property on April 10, 1895, under U. S. Certificate No. 61.37, and to whom final Receiver's Receipt No. 3962, covering said property, was issued on July 31, 1901.
Goodson sold this property to Early C. Christian under date of October 4, 1900, by an authentic act wherein it was described as follows:"The south half of the southeast fractional quarter of Section One (1) Township Twenty (20) N Range Sixteen (16) W in the Parish of Caddo, Louisiana, together with all buildings and improvements thereon."
Christian conveyed to S. H. Nunnelly on March 4, 1901, by an authentic act wherein the property was described as follows:
"73 & 37/100 acres of land described as follows:Commencing at the South East Corner of Section One (1) T. 20 Twenty N. R. 16 West & running North to Clear Lake 7.50 chains to corner stake set by surveyor, thence 40.00 chains West to corner stake, Thence 20.00 chains North to stake corner Thence 32.00 chains to Lake Shore.
"Being Fractional S½ of SE¼ of Section (1) One T 20 North Range 16 West La. Meridian in Caddo Parish, Louisiana together with all buildings & improvements thereon."
Nunnelly transferred to D. C. Richardson, Sr., an undivided one-half interest in this property (described as in his act of purchase from Christian), as well as in other property, by an authentic act dated July 13, 1901.
On May 14, 1908, by authentic act Richardson and Nunnelly partitioned their joint holdings; and as part of their respective shares Nunnelly received: "North 25 acres of SW¼ of SE¼ Sec. 1, T 20 N, R 16 W, less five acres sold out of NE corner of said quarter to W. E. Green." and Richardson received: "Fr. (Fractional) SE¼ of SE¼ Sec. 1, T 20 R 16 W less fifteen acres sold off of said quarter to G. B. Dawes, Trustee."
D. C. Richardson, Sr., conveyed the property which he received in the Southeast quarter of Section 1 to Mansfield Oil Company, by deed June 8, 1908.
Nunnelly conveyed to Oil City Development Company, who created and established from a part of the property a subdivision known as White Oak Subdivision, and later, an extension or annex thereto known as White Oak Annex. The plats of both the subdivision and its northward extension show the eastern boundary of either to be the western boundary of the SE¼ of the SE¼ of Section 1, which is 1320 feet west of the Southeast corner of the Section. There is concededly a conflict between the location of that corner, as found by the original Government surveyor in 1839, and which the surveyors who platted the Subdivision and Annex obviously followed, *300 and the Section corner as "discovered" and relocated in 1913-14 by the then Supervisor in Chief of Surveys of the General Land Office, Interior Department of the United States, Mr. Arthur D. Kidder. This conflict results in a hiatus between the division line between the Southwest and Southeast quarters of the Southeast quarter of Section 1, as relied on by the developers of White Oak Subdivision and White Oak Annex on one side of the line, and by the transferees of D. C. Richardson, Sr., on the other side of the line, and the division line as computed by reference to the corrected, or "Kidder", section corner.
It is to be noted that the division line between the Southwest Quarter and the Southeast Quarter of the Southeast Quarter of Section 1 is an interior, dependent line, and was never located on the ground by either Warren, the original U. S. Government surveyor in 1839, or Kidder in 1913-14.
Proceeding on the theory that there was a strip of land lying between the line of the subdivision/annex and the division boundary between the Southwest and Southeast quarters of the Southeast Quarter of Section 1, and that Oil City Development Company was technically the owner thereof, I. R. Packard acquired this "strip" on April 30, 1947, and leased it to Mills Tooke Properties, Inc., on November 13, 1947. The latter have brought in a producing oil well.
Plaintiffs do not own any of the surface rights in either the Southeast or the Southwest quarters of the Southeast Quarter of Section 1. They brought suit to be adjudged the owners of the minerals under the so-called "strip", which they contend is within the western limits of their property (i. e. the property to which they have the mineral rights.) The trial court gave judgment for the defendants, finding hat the Southeast corner as established by the Kidder survey is the true corner, and that the "strip" is therefore within the eastern bounds of the property acquired by S. H. Nunnelly in 1908. It apparently based its decision on the case of Russell v. Producers' Oil Company, 143 La. 217, 78 So. 473, wherein this Court had occasion to consider another boundary dispute in this same Township 20, but in Section 3 thereof, and accepted the Kidder corner locations by way of resolving the conflict between various local surveyors as to the location of an interior, dependent line.
The question thus presented for our determination is not the correctness of the Kidder survey, but whether rights acquired in good faith under one Government survey can be subsequently altered or lost by a subsequent Government survey.
Defendants' whole case is based on a resurvey made by Kidder nearly eighty years after the original survey, wherein Kidder set up lines that are different from the lines established by the survey under which the patent issued, and the rights of all parties must be governed. "The courts have power to protect the private rights of a party who has purchased lands in good faith from the government against the interferences or appropriations of corrective resurveys made by the Land Department, subsequent to such purchase." Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566. Obviously, the Government has the right to make new surveys, but where it has previously parted with the title, a new survey does not preclude a prior purchaser from asserting whatever title he has acquired by his older patent as against one claiming under the new survey. Slack v. Orillion, 1839, 13 La. 56, 57. If this principle is controlling even as against the Government itself, is it not even more binding as against one who claims with his opponent from a common ancestor in title?
In Cage v. Danks, 13 La.Ann. 128, the Court said:"The District Judge correctly assumed that the original survey referred to in the patent to defendant's vendors could not be set aside and disregarded by any recent survey which the Government might make for its own purposes. The United States having parted with its title by a patent legally issued, and upon surveys legally made by itself and approved by the proper department can never impair *301 the title so granted by any subsequent survey."
See also Work v. Beachland Development Co., 57 App.D.C. 225, 19 F.2d 699; Matthews v. Barker, D.C., 30 F.Supp. 464; Russell v. Maxwell Land Grant Company, 158 U.S. 253, 15 S.Ct. 827, 39 L.Ed. 971; Kean v. Calumet Canal and Improvement Company, 190 U.S. 452, 23 S.Ct. 651, 47 L.Ed. 1134; Lane v. Darlington, 249 U.S. 331, 39 S.Ct. 299, 63 L.Ed. 629; and Le Breton, Curator of the Succession of Jean Gravier, v. Lewis, 5 Rob. 479.
But apart from the jurisprudence, the Congressional statute itself under which the Kidder survey was made provided that, first, such resurveys or retracements were to affect only public lands remaining undisposed of, and second, that they were not to be executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands affected thereby. We quote this statute as follows:"Resurveys or retracements to mark boundaries of lands undisposed of. The Secretary of the Interior may, as of March 3, 1909, in his discretion cause to be made, as he may deem wise under the rectangular system on that date provided by law, such resurveys or retracements of the surveys of public lands as, after full investigation, he may deem essential to properly mark the boundaries of the public lands remaining undisposed of: Provided, That no such resurvey or retracement shall be so executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands affected by such resurvey or retracement: Provided further, That not to exceed 20 per cent of the total annual appropriation for surveys and resurveys of the public land shall be used for the resurveys and retracements authorized hereby." U.S.C. A., Title 43, § 772. (Italics ours.)
Kidder himself recognized the limitation on his authority when he wrote on the face of the plat:"Titles and areas based upon the original approved plats remain undisturbed for position and description."
It would be highly illogical for this Court to contravene the intent of the statute under which Kidder acted as well as his own intent, and re-shuffle all the land holdings in Section 1 to the east. This would undoubtedly engender a multitude of litigious controversies, ad infinitum.
Having reached this conclusion, it is unnecessary for us to pass on the pleas of estoppel and prescription acquirendi causa of 10, 20 and 30 years urged by the plaintiffs, since we find that the "Packard strip" does not exist at all, except in the mind of defendants, and that the land described by that term is actually located in the Southeast quarter of the Southeast quarter of Section 1, according to the original Government survey.
We cannot say that proof has been established that the present owners and operators of the well are in bad faith. The matter of the two surveys which were necessary for decision and the fact that the owners went to an expenditure of $13,015.20, show the operation in their mind of the belief that they had a just title. The owners of the producing well not having drilled in bad faith, they should be paid the cost of drilling by the plaintiffs, amounting to the sum of $13,015.20.
For the reasons above assigned, the judgment of the District Court is reversed, annulled and set aside, and judgment is hereby rendered in favor of plaintiffs, decreeing them to be the owners of the minerals under the so-called "Packard strip" and ordering defendants to make a full and complete accounting to them of all minerals saved and produced from the well located thereon, reserving to defendants the right to recover in a separate proceeding the $13,015.20 expended by them in drilling said well, costs to be paid by defendant.

On Rehearing
FOURNET, Chief Justice.
The plaintiffs, Rowland Savage, John Graham Savage, and Bill Gary, claiming to have been disturbed in their possession as owners of all the mineral rights affecting the fractional southeast quarter of the southeast quarter of Section 1, T. 20 N., R. 16 W., Caddo Parish, Louisiana, less the south 495 feet thereof, by the drilling of a *302 well known as Packard #1 within the westernmost limits of the above described property, instituted proceedings against defendants, I. R. Packard, who claims to be the owner of a strip of land on which the above well is located, 37.27 feet wide and 376.94 feet long, containing approximately 71/100ths of an acre; Mills Tooke Properties, Inc., as mineral lessee from Packard; and A. G. Thompson, Quad Drilling Corporation, and Stanley W. Metcalf, who acquired overriding royalties from Mills Tooke Properties, Inc.; seeking to be declared the owners of all the oil, gas and other minerals in and under the above described property including the strip of land claimed by the defendants, and ask for an accounting of all the oil produced, saved and sold from the Packard #1 well. In the alternative, if the court should conclude this strip is not in their title, plaintiffs claim title thereto by estoppel and by the prescription of 10 and 30 years acquirendi causa.
Separate answers were filed by I. R. Packard (in which he was joined by Quad Drilling Corporation) and by Mills Tooke Properties, Inc. (in which it was joined by A. G. Thompson and Stanley W. Metcalf), containing substantially the same denials and averments, with the exception that Mills Tooke Properties, Inc., called Packard in warranty and in an alternative plea it seeks to recover the cost of drilling the well. The defendants denied having disturbed the plaintiffs in their possession, claiming that the property in controversy, hereinafter to be referred to as the Packard strip, is located entirely within the southwest quarter of the southeast quarter of Section 1, and not within the boundaries of plaintiffs' mineral servitude.
The plaintiffs and defendants deraign their respective titles from a common author, S. H. Nunnelly, who, on March 4, 1901, acquired the fractional south half of the southeast quarter of Section 1, T. 20 N., R. 16 W., Caddo Parish, Louisiana, this being the same property that was entered by Wilson More Goodson and subsequently patented to him by the United States government "according to the Official Plat of the Survey of the said Land, returned to the General Land Office by the Surveyor General." At a later date Nunnelly conveyed an undivided half interest in the property to D. C. Richardson, and shortly thereafter there was a partition, Richardson taking the fractional southeast quarter of the southeast quarter of Section 1, less the south 495 feet, and Nunnelly the southwest quarter of the southeast quarter of Section 1, less a certain acreage previously sold. Richardson conveyed his holdings to the Mansfield Oil Company, and on May 31, 1946, that company deeded to the plaintiffs the mineral rights in the property. Nunnelly conveyed his holdings to the Oil City Development Company in 1913, and that company immediately laid out and platted within the southwest quarter of the southeast quarter a development known as the White Oak Subdivision, duly recording the plat in the conveyance records of Caddo Parish. On April 30, 1947, the Oil City Development Company conveyed to defendant Packard the strip here in dispute. This strip was discovered by Robert S. Cooper, a surveyor, of Shreveport, who had been commissioned in 1946 to make a survey in the southeast quarter of Section 1 and who found during the course thereof that the west line of the Mansfield Oil Company tract did not coincide with the east line of the White Oak Subdivision as laid out on the groundeven though the plat of that subdivision indicated that the northeast corner thereof was the northeast corner of the southwest quarter. He thereupon obtained a copy of the field notes of Arthur D. Kidder, government surveyor, and by following Kidder's survey found that there remained a strip of land lying between the eastern boundary of the White Oak Subdivision and a line dividing the southwest from the southeast quarter of the southeast quarter.
It is the plaintiffs' contention that the recorded plat of the White Oak Subdivision correctly designated the division line of the quarter in accordance with the original government survey of 1839 (Warren survey); and that the eastern boundary of that subdivision is unalterably tied to and coincides with the western boundary of the southeast quarter of the southeast *303 quarter of Section 1. On the other hand, the defendants claim that the strip lies within the southwest quarter of the southeast quarter and to the east of White Oak Subdivision, basing their claim on a retracement survey of the Township in 1913-1914 by Arthur D. Kidder, Supervisor-in-Chief of Surveys, U. S. Department of the Interior, under which Kidder located and remonumented the southeast corner of Section 1 at the spot which he believed to be the original government corner; and relying on the case of Russell v. Producers' Oil Company, 138 La. 184, 70 So. 92, as being conclusive of the correctness of the Kidder survey in its entirety. The plaintiffs for their part, and in the alternative, claim that they are nevertheless the owners of the property because (1) if the defendants are correct in their contention as to the location of the strip, they are estopped to deny that it falls within the title of plaintiffs due to the action of Oil City Development Company, ancestor in title of Packard, which company caused to be recorded its plat of the White Oak Subdivision with the indication thereon that the eastern boundary of the subdivision coincided with the western boundary of the southeast quarter of the southeast quarter of Section 1; and (2) that the plaintiffs have maintained possession by continuously exercising their servitude through development of the area for the production of oil, gas, and other mineralson the basis of which they plead prescription of ten and thirty years, acquirendi causa.
These issues were resolved in favor of the defendants in the lower court. The trial judge, in a well considered opinion, disposed of the plaintiffs' primary contention by concluding that the corner found by Kidder was the true southeast corner of Section 1, and that the Packard strip was land undisposed of by Packard's ancestor in title, and lying between the east boundary of the White Oak Subdivision and the line dividing the quarter section; and in disposing of the alternative plea, concluded that he knew of no authority, and none had been cited to him, which would permit the owner of a mineral servitude to acquire beyond the limits of his title by prescription acquirendi causa; also, that since plaintiffs must rely on the strength of their own title and not on the weakness of that of their adversary, the plea of estoppel was without merit.
With respect to plaintiffs' alternative plea of prescription, we are fully in accord with the conclusions of the trial judge. In the case of Goldsmith v. McCoy, 190 La. 320, 182 So. 519, this Court had occasion to point out that under the express provisions of the Revised Civil Code, Article 766, "Continuous nonapparent servitudes, and discontinuous servitudes, whether apparent or not, can be established only by a title. Immemorial possession itself is not sufficient to acquire them. * * *"; consequently, a mineral servitude cannot be acquired by prescription acquirendi causa. See, also, Long-Bell Petroleum Co. v. Tritico, On Rehearing, 216 La. 426, 43 So.2d 782; and Hanby v. Texas Company, 140 La. 189, 72 So. 933. Their claim to the property by estoppel is equally without merit because, conceding for the sake of argument that title to a mineral servitude could be acquired by estoppel, plaintiffs have neither alleged nor shown that they were caused to change their position, or were prejudiced, by acts of the defendants.
In order to dispose of the main issue, namely, plaintiffs' primary claim that the Packard strip falls to the east of the dividing line, it is necessary (since the patent to Goodson was issued in accordance with the Warren survey) to determine whether or not Kidder's location of the southeast corner of Section 1 is the "true corner" established by Warren, since, under the well established jurisprudence, as ably stated by the author of the original opinion of this Court, "* * * the Government has the right to make new surveys, but where it has previously parted with the title, a new survey does not preclude a prior purchaser from asserting whatever title he has acquired by his older patent as against one claiming under the new survey. Slack v. Orillion, 13 La. [56], 57," citing also Cage v. Danks, 13 La.Ann. 128; Work v. Beachland Development *304 Co., 57 App.D.C. 225, 19 F.2d 699; Matthews v. Barker, D.C., 30 F.Supp. 464; Russell v. Maxwell Land Grant Company, 158 U.S. 253, 15 S.Ct. 827, 39 L.Ed. 971; Kean v. Calumet Canal and Improvement Company, 190 U.S. 452, 23 S.Ct. 651, 47 L. Ed. 1134; Lane v. Darlington, 249 U.S. 331, 39 S.Ct. 299, 63 L.Ed. 629; and Le Breton, Curator of the Succession of Jean Gravier, v. Lewis, 5 Rob. 479.
We should remark here that the defendants' contention that the case of Russell v. Producers' Oil Company, supra, constitutes an approval of the entire Kidder survey (in which view the trial judge apparently concurred) is not correct. A perusal of the opinion in that case will show that a boundary dispute was involved, that the experts were equally divided as to the true location of the boundary, and that the court decided according to what it considered a preponderance of the evidence. The opinion is authoritative only as to the location of the boundary line, and while it may have some persuasive value, so far as other titles are concerned it is not controlling.
Warren, in making the survey of the township in 1839, which survey was approved by the Surveyor General, monumented the four corners of Section 1. Although subsequent surveys were made in 1846, 1854, 1871 and 1896, it was not until 1913 that the government sent Kidder to make a dependent resurvey of the township, pursuant to authority granted to the Secretary of the Interior by Act of Congress. The resurvey consisted of a retracement of the lines of the original surveys for the purpose of identifying the existing evidence of the original lines and corners, followed by a reestablishment of the lost corners by proportionate measurement, and a remonumenting of all corners with iron posts. On the basis of what Kidder considered to be sufficient evidence of the previous location of original bearing trees, he located and remonumented the southeast corner of Section 1, his evidence being that found by W. E. Martin, Civil Engineer of Shreveport, in a previous survey, and verified by Kidder's own findings at the location. The original bearing trees as marked by Warren in 1839 had disappeared, and the roots of the trees had been removed for evidence in a suit at the time of Martin's survey; but Martin confirmed the location of the corner in a report to the Court, in which he stated that he had located the southeast corner of Section 1 as originally established, from the roots of four trees and that "all these tree roots bear correctly both for course and distance from a common center or corner." Kidder states in his field notes that "the holes from which the roots had been taken were identified and are correct for position. I dug deeper in each of the holes" and found bits of rotten root. Kidder concluded that this corner was the "true point for the corner of Secs. 1, 6, 7 and 12, on the E. bdy. of T. 20 N., R. 16 W." The entire resurvey was approved in 1916, and is commonly referred to as the Kidder survey; the southeast corner of Section 1 will be referred to herein as the Kidder corner. That corner, as thus established, would place the Packard strip within the southwest quarter of the southeast quarter, and within the title of defendant Packard.
The plaintiffs attack the correctness of the relocation of the southeast corner of Section 1 by Kidder, and in proof thereof rely on the field notes of the 1839 survey and on Warren's plat of the survey. Through the testimony of their expert witness, Mr. George E. Dutton, of Shreveport, who has been a licensed surveyor since 1918 and from that time actively engaged in his profession in the area, the plaintiffs make the following showing in support of their position: If a survey is begun at the nearest undisputed Warren corner, which in this case is the east quarter corner of Section 12 (lying immediately south of Section 1), and a distance of 40 chains due north is traversedsuch being indicated on the 1839 platthe point thus reached is the correct location for the southeast corner of Section 1; then, a distance of 1320 feet, or 1/4 mile, due west on the south boundary of Section 1 is the correct point for dividing the southwest quarter from the southeast quarter (of the SE 1/4); a distance of 495 feet north on this dividing line reaches the southeast corner of White *305 Oak Subdivision, and causes the eastern boundary of the subdivision to coincide with the western boundary of the southeast quarter (of the SE 1/4)  all of which ties in with the physical layout of the subdivision on the ground, and results in the Packard strip lying within the southeast quarter (of the SE 1/4). They point out that from the same starting point the Kidder map shows a distance of 39 chains 32 links, and that his bearing instead of being due north veers 53 minutes east, which causes the Kidder corner to fall some 37 feet east and some 39 feet south of the location indicated by the 1839 map.
It appears that when preparations were in progress for drilling Packard #1 well, the plaintiffs, having made timely protest, employed Dutton to make a plat of the true location of the White Oak Subdivision, and to show it with reference to the west line of the Mansfield Oil Company property, instructing him to substantiate this plat with the fixed evidence that he could find on the ground in the way of hedges, fences, corner posts, and other signs of occupation. His method of procedure in making his map was to first indicate thereon the White Oak Subdivision (laid out in 1913, before the Kidder survey was made), as it lay on the ground; then "tie it in" with the Kidder corner. To establish his beginning points, he used the official recorded map of the White Oak Subdivision and the Warren survey of 1839. Although Dutton claims that he is supported by Warren's field notes, it is well to observe that Warren came south in his survey, having begun at the northwest corner of Section 1; he "ran South 80 chs then East 80 chs and set the first mile posts on the line going south as follows: * * *" (here follows description of bearing trees). These are Warren's field notes to describe his location of the southeast corner of Section 1.
Dutton admits that he did not use single proportionate measurement or double proportionate measurement in arriving at his corner, but simply ran "due north" a distance of 40 chains from his starting pointalthough he acknowledged that "standard of alignment" and "proportionate measurement" are essential surveying principles to be followed in retracement surveys. Dutton defended his failure to employ such principles by saying that he had to go only a short distance, a half mile, and therefore could not have been very much in error. Further, Dutton admitted that he had no data on the 1839 survey other than that for the immediate area, and that he had proceeded no farther than from the east quarter corner of Section 12 to the southeast corner of Section 1though there is a known Warren corner farther north on the east line of Township 21, and one farther south at the east quarter corner of Section 13. It is therefore clear that the witness' testimony is limited to a survey of this small area, without any effort to properly apportion bearing and distances or to check his findings with the known monuments nearby, whereas the Kidder resurvey covered the whole area, including several townships, and courses and distances were calculated with the greatest care, giving particular attention to known monuments. A fact of importance is that Kidder's map, based on certain perpetuated monuments, shows that the entire eastern township line, which passes through the corner here involved, is inclined to bear to the east on its northward course.
On further cross examination of the witness Dutton, these points were made: The map and field notes of the 1839 survey show a distance northward, from the southeast corner of Section 1, of 7 chains 50 links to the traverse line of Clear Lake (which covers a large portion of the east half of Section 1); Kidder's map and field notes are identical for this distance; but Dutton testified that in establishing his southeast corner (which is 39 feet north and 37 feet west of Kidder's) he did not check with the traverse line of Clear Lake and made no measurement in that direction. Nor did he check his survey of the southeast quarter of Section 1 with the physical monument evidencing the quarter corner on the west boundary of Section 1 (a known Warren corner, as to which Kidder's field notes state that he found "both of the original bearing trees"); the *306 point is developed, however, that if Dutton had started his survey at this west quarter corner and come due south 40 chains (the course followed by Warren according to his field notes), this would shove the whole south line of the section to the east, throw the Packard strip entirely within the southwest quarter of the southeast quarter, and cause the southeast corner of Section 1 to fall about 72 feet east of Dutton's claimed southeast corner and some 37 feet east of Kidder's corner, besides encroach on a strip of Section 12, immediately south.
It is our opinion, therefore, that the plaintiffs have failed to establish by a preponderance of the evidence their contention that the southeast corner of Section 1 as established by Kidder is not the true location of the Warren corner.
The record reveals that surveyors long before had realized that the southeast corner, according to courses and distances, would fall west and north of the Kidder location, for in Martin's report to the Court in 1912, referred to above and incorporated in Kidder's field notes, Martin states that he had to look south and east of a random corner temporarily established by him to locate the Warren corner, and that the key to do so was given him through the finding of the bearing tree of a nearby true corner similarly off the course and distance bearing; and ever since Kidder's
relocation of the southeast corner it is shown that civil engineers in making surveys in that area have universally accepted this corner. Dutton himself admitted he had heard no criticism of the survey, and exhibits reveal that he used the corner as established by Kidder continuously in making oil well locations, not only before but also since his survey for this case.
Counsel for the plaintiffs and appellants argue in the opening paragraph of a brief filed here on October 13, since this case was argued and submitted on rehearing, that of the five defendants here, one, A. G. Thompson, claiming an overriding royalty interest, did not apply for a rehearing; and of the four who did apply for a rehearing, I. R. Packard, claiming ownership of the land, Quad Drilling Corporation, claiming an overriding royalty, Mills Tooke Properties, Inc., the mineral lessee, and Stanley W. Metcalf, claiming an overriding royalty, the latter two withdrew their application for a rehearing, acquiescing in the opinion of this Court handed down on May 29, 1950; thus leaving only a 3/16th mineral interest involved in this law suit.
While it is true that where one fails to apply for a rehearing, or withdraws his application for a rehearing once applied for, judgment as to that party becomes final after the required time for application for a rehearing has expired, this does not mean that there remains only a 3/16th mineral interest involved in this suit as contended by plaintiffs. Counsel has obviously overlooked the fact that the party defendant who did not apply for a rehearing, and the two who withdrew their application after filing, are not owners of any part of the realty involved, nor of any of the mineral rights. The defendant Mills Tooke Properties, Inc., was only Packard's lessee; and the defendants Thompson and Metcalf acquired only so-called overriding royalties from the lessee and therefore their rights are not greater than those of Mills Tooke Properties, Inc.
It is therefore ordered, adjudged, and decreed that the judgment of the lower court, rejecting the plaintiffs' demands and dismissing the suit at their cost, and ordering cancellation of notice of lis pendens recorded by them in the mortgage records of Caddo Parish, is affirmed. The right to apply for a rehearing is specially reserved to the plaintiffs.