MOISE, Justice.
Plaintiffs in this suit, Rowland Savage, John Graham Savage and Bill Gary were cast in judgment by the District Court, and they have appealed.
They are the transferees from Mansfield Oil Company, by deed dated May 31, 1946, of the mineral rights in the following described property: — “Fractional Southeast Quarter of Southeast Quarter (SE)4 of SEi/4), less South 495 feet thereof, Section 1, Township 20 N, Range 16 W, Cad-do Parish, Louisiana.”
This dispute involves tire ownership of minerals lying under a strip of land which plaintiffs contend lies within the westernmost limits of the above described property, said strip being described in accordance with their contention as follows: — ■ “Beginning at the southwest corner of the land hereinabove described (Fractional Southeast Quarter of Southeast Quarter (SEJ4 of SEJ4) of said Section 1, less the South 495 feet thereof) run thence South 89 degrees, 37 minutes East 37.27 feet, then North 0 degrees, 39 minutes East 376.94 feet, thence West 37.37 feet, thence South 0 degrees, 38 minutes West 376.94 feet to point of beginning.”*
A resume of the chain of title of the entire South Half of the Southeast Quarter of Section 1 will facilitate an understanding of the present litigation.
Under date of March 7, 1902, “the South half of the South East fractional quarter *642 of Section one in Township twenty North of Range sixteen West of Louisiana Meridian in Louisiana, containing seventy-three acres and thirty-seven hundredths of an acre according to the Official Plat of the Survey of the said Land, returned to the General Land Office by the Surveyor General” was patented by the United States of America to Wilson More Goodson, who had entered this property on April 10, 1895, under U. S. Certificate No. 61.37, and to whom final Receiver’s Receipt No. 3962, covering said property, was issued on July 31, 1901.
Goodson sold this property to Early C. Christian under date of October 4, 1900, by an authentic act wherein it was described as follows: — “The south half of the southeast fractional quarter of Section One (1) Township Twenty (20) N Range Sixteen (16) W in the Parish of Caddo, Louisiana, together with all buildings and improvements thereon.”
Christian conveyed to S. H. Nunnelly on March 4, 1901, by an authentic act wherein the property was described as follows:—
“73 & 37/100 acres of land described as follows: — Commencing at the South East Corner of Section One (1) T. 20 Twenty N. R. 16 West & running North to Clear Lake 7.50 chains to corner stake set by surveyor, thence 40.00 chains West to corner stake, Thence 20.00 chains North to stake corner Thence 32.00 chains to Lake Shore.
“Being Fractional S% of SE14 of Section- (1) One T 20 North Range 16 West La. Meridian in Caddo Parish, Louisiana together with all buildings & improvements thereon.”
Nunnelly transferred to D. C. Richardson, Sr., an undivided one-half interest in this property (described as in his act of purchase from Christian), as well as in other property, by an authentic act dated July 13, 1901.
On May 14, 1908, by authentic act Richardson and Nunnelly partitioned their joint holdings; and as part of their respective shares Nunnelly received: “North 25 acres of SW1/4 of SE % Sec. 1, T 20 N, R 16 W, less five acres sold out of NE corner of said quarter to W. E.. Green.” and Richardson received: “Fr. (Fractional) SEi/4 of SEj4 Sec. 1, T 20 R 16 W less fifteen acres sold off of said quarter to G. B. Dawes, Trustee.”
D. C. Richardson, Sr., conveyed the property which he received in the Southeast quarter of Section 1 to Mansfield Oil Company, -by deed June 8, 1908.
Nunnelly conveyed to Oil City Development Company, who created and established from a part of the property a subdivision known as White Oak Subdivision, and later, an extension or annex thereto known as White Oak Annex. The plats of both the subdivision and its northward extension show the eastern 'boundary of either to be the western boundary of the SEj4 of the SEJ4 of Section 1, which is 1320 feet *644 west of the Southeast corner of the Section. There is concededly a conflict between the location of that corner, as found by the original Government surveyor in 1839, and which the surveyors who platted the Subdivision and Annex obviously followed, and the Section corner as “discovered” and relocated in 1913-14 by the then Supervisor in Chief of Surveys of the General Land Office, Interior Department of the United States, Mr. Arthur D. Kidder. This conflict results in a hiatus between the division line, between the Southwest and Southeast quarters of the Southeast quarter of Section 1, as relied on by the developers of White Oak Subdivision and White Oak Annex on one side of the line, and by the transferees of D. C. Richardson, Sr., on the other side of the line, and the division line as computed by reference to the corrected, or “Kidder”, section corner.
It is to be noted that the division line between the Southwest Quarter and the Southeast Quarter of the Southeast Quarter of Section 1 is an interior, dependent line, and was never located on the ground by either Warren, the original U. S. Government surveyor in 1839, or Kidder in 1913-14.
Proceeding on the theory that there was a strip of land lying between the line of the subdivision/annex and the division boundary between the Southwest and Southeast quarters of the Southeast Quarter of Section 1, and that Oil City Development Company was technically the owner thereof, I. R. Packard acquired this “strip” on April 30, 1947, and leased it to Mills Tooke Properties, Inc., on November 13, 1947. The latter have brought in a producing oil well.
Plaintiffs do not own any of the surface rights in either the Southeast or the Southwest quarters of the Southeast Quarter of Section 1. They brought suit to be adjudged the owners of the minerals under the so-called “strip”, which they contend is within the western limits of their property (i. e. the property to which they have the mineral rights.) The trial court gave judgment for the defendants, finding that the Southeast corner as established by the Kidder survey is the true corner, and that the “strip” is therefore within the eastern bounds of the property acquired by S. H. Nunnelly in 1908. It apparently based its decision on the case of Russell v. Producers’ Oil Company, 143 La. 217, 78 So. 473, wherein this Court had occasion to consider another boundary dispute in this same Township 20, but in Section 3 thereof, and accepted the Kidder corner locations by way of resolving the conflict between various local surveyors as to the location of an interior, dependent line.
The question thus presented for our determination is not the correctness of the Kidder survey, but whether rights acquired in good faith under one Government sur *646 vey can be subsequently altered or lost by a subsequent Government survey,
Defendants’ whole case is based on a resurvey ‘ made by Kidder nearly eighty years after the original survey, wherein Kidder set up lines that are different from the lines established by the survey under which the patent issued, and the rights of all parties must be governed. “The courts have power to protect the private rights of a party who has purchased lands in good faith from the government against the interferences or appropriations of corrective resurveys made by the Land Department, subsequent to such purchase.” Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566. Obviously, the Government has the right to make new surveys, but where it has previously parted with the title, a new survey does not preclude a prior purchaser from asserting whatever title he has acquired by his older patent as against one claiming under the new survey. Slack v. Orillion, 1839, 13 La. 56, 57. If this principle is controlling even as against the Government itself, is it not even more binding as against one who claims with his opponent from a common ancestor in title?
In Cage v. Danks, 13 La.Ann. 128, the Court said :■ — -“The District Judge correctly assumed that the original survey referred to in the patent to defendant’s vendors could not be set aside and disregarded by any recent survey which the Government might make for its own purposes. The United States having parted with its title by a patent legally issued, and upon surveys legally made by itself and approved by the proper department can never impair the title so granted by any subsequent survey.”
See also Work v. Beachland Development Co., 57 App.D.C. 225, 19 F.2d 699; Matthews v. Barker, D.C., 30 F.Supp. 464; Russell v. Maxwell Land Grant Company, 158 U.S. 253, 15 S.Ct. 827, 39 L.Ed. 971; Kean v. Calumet Canal and Improvement Company, 190 U.S. 452, 23 S.Ct. 651, 47 L.Ed. 1134; Lane v. Darlington, 249 U.S. 331, 39 S.Ct. 299, 63 L.Ed. 629; and Le Breton, Curator of the Succession of Jean Gravier, v. Lewis, 5 Rob. 479.
But apart from the jurisprudence, the Congressional statute itself under which the Kidder survey was made provided that, first, such resurveys or retracements were to affect only public lands remaining undisposed of, and second, that they were not to be executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands affected thereby. We quote this statute as follows: — “Resurveys or retracements to mark boundaries of lands ^indisposed of. The Secretary of the Interior may, as of March 3, 1909, in his discretion cause to be made, as he may deem wise under the rectangular system on that date provided by law, such resurveys or retracements of the surveys of public lands as, after full investigation, he may deem essential to properly mark the boundaries of the public lands remaining undis *648 posed of: Provided, That no such resurvey or retracement shall be so executéd as to impair the bona fide rights or claims of a/ny claimant, antryman, or owner of lands affected by such reswvey or retracennent: Provided further, That not to exceed’ 20 per cent of the total annual appropriation for surveys and resurveys of the public land shall be used for the resurveys and retracements authorized hereby.” U.S.C. A., Title 43, § 772. (Italics ours.)
Kidder himself recognized the limitation on his authority when he wrote on the face of the plat: — “Titles and areas based upon the original approved plats remain undisturbed for position and description.”
It would be highly illogical for this Court to contravene the intent of the statute under which Kidder acted as well as his own intent, and re-shuffle all the land holdings in Section 1 to the east. This would undoubtedly engender a multitude of litigious controversies, ad infinitum.
Having reached this conclusion, it is unnecessary for us to pass on the pleas of estoppel and prescription acquirendi causa of 10, 20 and 30 years urged by the plaintiffs, since we find that the “Packard strip” does not exist at all, except in the mind of defendants, and that the land described by that term is actually located in the Southeast quarter of the Southeast quarter of Section 1, according to the original Government survey.
We cannot say that proof has been established that the present owners and operators of the well are in bad faith. The matter of the two surveys which were necessary for decision and the fact that the owners went to1 an expenditure of $13,015.20, show the operation in their mind of the belief that they had a just title. The owners of the producing well not having drilled in 'bad faith, they should be paid the cost of drilling by the plaintiffs, amounting to the sum of $13,015.20.
For the reasons above assigned, the judgment of the District Court is reversed, annulled and set aside, and judgment is hereby rendered in favor of plaintiffs, decreeing them to be the owners of the minerals under the so-called “Packard strip” and ordering defendants to make a full and complete accounting to them of all minerals saved and produced from the well located thereon, reserving to defendants the right to recover in a separate proceeding the $13,015.20 expended by them in drilling said well, costs to 'be paid by defendant.